In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-1081, 10-1083, & 10-1202

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ISRAEL PILLADO, IRINEO GONZALEZ, and
LEOBARDO LARA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
Nos. 08 CR 50017-1, 2 and 5—**Frederick J. Kapala**, *Judge.*

ARGUED MAY 9, 2011—DECIDED SEPTEMBER 7, 2011

Before EASTERBROOK, *Chief Judge,* and WOOD and
WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* A law enforcement operation
that began with the promising interdiction of 943 kilo-
grams of marijuana, shipped from Jalisco, Mexico, ended
less than admirably. When government agents executed
a "controlled delivery" to an address in McHenry, Illinois,
close to the one on the shipping manifest (the address

listed did not exist), they arrested five people. By the
government's own account, three persons ensnared in
the sting operation had no prior connection to the illicit
cargo. They were merely laborers who happened to be
working on-site when they were persuaded to unload the
truck. Unload it they did, and after the cargo was on
the ground, police raided the scene. The other two defen-
dants had some prior connections to the shipment,
though they had never met the three men who helped to
unload the truck. The prosecution charged all five defen-
dants with conspiracy to possess marijuana with the
intent to distribute in violation of 21 U.S.C. § 846, and
possession with the intent to distribute in violation of
§ 841(a)(1). One defendant pleaded guilty and testified
against the others, who were tried together. Leobardo
Lara was acquitted on the conspiracy count but convicted
for possession with the intent to distribute. The other
three defendants were convicted on both counts. Israel
Pillado, Irineo Gonzalez, and Lara challenge their convic-
tions and sentences on an assortment of grounds; the
fourth defendant has not appealed. We reverse Lara's
conviction and remand for a new trial. We affirm Gonza-
lez's conviction but vacate his sentence and remand for
reconsideration. Pillado is out of luck; we affirm his
conviction and sentence.

# I

The defendants raise a variety of arguments that require
us to take two different perspectives when viewing the
facts. Gonzalez and Lara argue that the court erroneously
failed to give their desired instructions to the jury. In

addressing this contention, we view the evidence in the light most favorable to the defendants. Pillado argues that the evidence was insufficient to support his conviction; to evaluate this argument we must view the evidence in the light most favorable to the government. We recount the undisputed facts in the record and point out disputes where relevant.

On March 17, 2008, customs agents in Charleston, South Carolina, conducted a routine x-ray examination of a shipping container arriving from Mexico. They detected irregularities that are typical of drug smuggling: dense material packed in hollow objects, with the contrasting densities evident in the x-ray images. The agents then conducted a physical search, at which point they discovered marijuana "bricks" stuffed into approximately 204 decorative mud vases. One thing led to another, and a week later Immigration and Customs Enforcement (ICE) Agent Warran was *en route* to the address in McHenry, Illinois, posing as a truck driver for a controlled delivery. Warran paired up with an actual truck driver, Joe Nardo, who had worked with the government before on sting operations. Nardo's job was to help Warran simulate the conditions under which cargo is generally delivered. The goal, as Warran explained on the stand, was to apprehend as many people as possible connected to the shipment. At some point along the way, they realized that the River Road address on the shipping manifest was a fake. They contacted the owner of a fairly large nearby property, which the parties call an "industrial park," with a few businesses and garages where equipment is stored. Agents notified the property's owner,

Doc Roberts, that they would be executing a controlled delivery on his property and later paid him $1,000 for his cooperation.

There was another glitch. Agent Warran had difficulty locating "Hector Alfonso Huerta," the importer and consignee whose name was on the shipment manifest (along with the nonexistent address). To find someone to accept the delivery, agents contacted the shipping company in Mexico and eventually connected with Irineo Gonzalez. Warran and Gonzalez planned to meet at the industrial park on River Road the night of March 25. That night, Gonzalez arrived in a vehicle driven by a woman identified only as "Maria" and another person, Manuel Gomez.

Using hidden devices, the government recorded the exchange between Gonzalez and Warran. Gonzalez spoke only Spanish, and so Maria translated for him. Through Maria, Gonzalez explained to Warran that he was prepared to unload the entire shipment by himself, without any unloading equipment. (Maria and Gomez were unwilling to lend a hand.) Though Gonzalez insisted that he wanted to unload the cargo alone, Warran adamantly refused, saying that the load was too large and it would take several hours for him to complete the task. During this time, according to phone records searched after the arrest, Gonzalez and Gomez made calls to unidentified persons in Mexico. In the end, Warran instructed Gonzalez to return the next day with more people and equipment. Warran and Nardo also required Gonzalez to pay $450 for the delay, which he

did. They then made a plan to reconvene at noon the next day.

Enter Gonzalez's co-defendants. Israel Pillado met Gonzalez for the first time at a restaurant in Chicago the next morning (March 26), though how the meeting occurred is disputed. Pillado asserted that he ran into someone known as "Individual A," whom he knew from church, at the restaurant, and Individual A introduced Pillado to Gonzalez. According to Pillado, Gonzalez was desperate for a ride to McHenry. Pillado agreed to drive him in exchange for gas money and payment for temporary license plates on his recently purchased used cargo van. The government points out that phone records show that Individual A contacted Pillado in the early morning hours of March 26 (after Warran rebuffed Gonzalez's plan to unload the shipment alone), and then again in the late morning. In the government's view, the phone calls show that the rendezvous between Pillado and Gonzalez at the restaurant was preplanned, not coincidental as Pillado asserts.

Pillado and Gonzalez stopped to get temporary plates for the cargo van on their way to McHenry. One of them went inside a currency exchange (each says it was the other) and registered the car to "Alfonso Huerta" at Pillado's home address. Along the way to McHenry, Warran called Gonzalez's cell phone looking for "Hector" (still believing that one of the defendants was Hector Alfonso Huerta, the person named in the shipping manifest) to coordinate the delivery. Pillado answered the phone as "Hector" and spoke to Warran about the logis-

tics. In various calls, Pillado explained that they would be there in a couple of hours and offered to pay Warran for any delay. Pillado also said, in response to Warran's questions, that they did not have a forklift to unload the cargo, but that they would have two to three more men present to unload.

In his post-arrest statement, as recounted by Agent Warran at trial, Pillado contended that he was merely speaking for Gonzalez during these phone conversations with Warran because Gonzalez did not speak English and could not communicate on his own. Pillado also said that during the journey Gonzalez was on the phone with someone in Mexico known as "Guero," who pressured Pillado to help unload the cargo. Pillado swears that he never knew exactly what was in the truck, but after talking to Guero he suspected it was something "big illegal," probably guns or drugs. The government's view of these facts is quite different. As the agents see things, Pillado spoke to Warran as "Hector" of his own volition, not merely as a translator or conduit, and he had a personal interest in arranging the logistics for the receipt of the shipment. His intention, the government contends, was to load his cargo van with the marijuana and transport it elsewhere.

Pillado and Gonzalez arrived at the industrial park, where Warran was waiting, around 1:30 p.m. But they inexplicably left seconds later. After a couple of hours, Warran too left the scene. Pillado and Gonzalez then returned and called Warran to let him know they were there. When Warran arrived with the cargo, Pillado and Gonzalez were waiting. Warran approached Pillado and

asked if he was Hector. Pillado responded, "No, that's my brother." (As it turned out, Pillado really has a brother named Hector.) Warran tried to get Pillado to sign the shipping manifest and open the container, but Pillado refused, saying Gonzalez was the "main guy."

Then one of the men who owned a business in the industrial park, Cardenas, took an interest in what was unfolding. The record contains nothing to suggest that Cardenas had any reason to believe that the truck contained anything other than legitimate goods. Cardenas chatted with Pillado, Gonzalez, and Warran for a short time, observing that it was odd that the shipment had been delivered to the industrial park when "Hector" appeared to be nowhere in sight. While this conversation was unfolding, Pillado was on the phone with someone who had gotten lost *en route* to the River Road address. After ending the call, Pillado abruptly left before the shipping container had been opened.

At that point, Cardenas found some bolt-cutters to open the truck. With Pillado gone, Cardenas translated for Gonzalez as they discussed what to do with the shipment, still apparently ignorant as to the contents. Gonzalez asked Warran and the other driver, Nardo, to help unload, but they refused. Cardenas then attempted to broker a deal with Nardo for the truck to be driven to a storage facility so Gonzalez could claim the shipment there later when he located "Hector." While these plans were in the works, Warran interjected his disapproval. Warran insisted that transporting and storing the cargo would be too expensive, and it was better to unload

immediately so that he and Nardo could head back to
South Carolina.

There is a gap in the recorded conversations at this
point. When the recordings pick up, the other defendants
have joined the scene. It appears that Cardenas had
summoned Arturo Morales, Casimoro Hernandez, and
Lara to the truck to discuss unloading. At this point
Gonzalez jumped in to the truck to inspect the contents.
In addition to neatly stacked Hewlett Packard boxes,
Gonzalez saw a few boxes toppled over and opened, along
with two broken mud vases exposing the marijuana. (ICE
agents had arranged the contents to ensure that the men
knew what they were dealing with once the truck was
opened.) Gonzalez then passed around a brick of mari-
juana and said the term "mota," apparently Spanish slang
for marijuana. Cardenas, surprised to see drugs in the
truck, immediately said he did not want to be part of the
operation and told Warran to get off the premises with
the truck. Warran refused to leave, insisting that the truck
had to be "f****** unloaded" on the premises because
the seal had been broken. Cardenas then left the scene,
saying he was going to call the landlord. For the next
several minutes, the four men just stood around as
Warran tried to persuade them to unload the truck. They
appeared unwilling to get involved and consulted with
each other for a while longer. At some point, Gonzalez
offered Morales, Hernandez, and Lara bricks of marijuana
for their participation, but Lara refused the offer. Eventu-
ally, Warran contacted Doc Roberts, the landlord, to
seek his permission to unload. Warran told the men

that Doc Roberts said it was fine to unload and that Roberts would "take responsibility" for whatever happened. Eventually, Lara, Hernandez, and Morales unloaded the truck while Gonzalez stood to the side, mostly watching and occasionally directing the others. Lara owned a bobcat forklift, which he used in the endeavor.

When the cargo was finally on the ground, Warran departed with the truck. Shortly thereafter, Pillado returned with the cargo van, and Individual A arrived in a separate car. After talking to some of the men, Pillado left again minutes later without getting close to the boxes or taking any marijuana. Several ICE agents then emerged from the surrounding area and arrested all of the suspects. The authorities found a loaded .38 caliber revolver on Lara when he was arrested, but no drugs or money. They were all advised of their *Miranda* rights and subsequently gave statements to the authorities. Meanwhile, another ICE agent picked up Pillado in Wauconda, Illinois, about 10 miles away. The authorities did not find any money, guns, or drugs in Pillado's van, though they did recover a hand-drawn map from Chicago to McHenry. Pillado was also advised of his *Miranda* rights, and he too gave a post-arrest statement.

At trial, Gonzalez and Pillado were convicted on both counts, and Lara was acquitted on the conspiracy count but convicted of possession of marijuana with the intent to distribute. All three appeal their convictions and sentences. We address each defendant's arguments in turn.

## II

### A. Leobarda Lara

1. Lesser Included Offense Instruction

We begin with Lara's argument that the district court erred in refusing to instruct the jury on the lesser offense of simple possession of marijuana, in addition to possession with intent to distribute. A defendant is entitled to a lesser offense instruction if: (1) the offense on which he seeks an instruction is a lesser-included offense; and (2) a rational jury could find him guilty on the lesser offense but acquit on the greater offense. *United States v. McCullough*, 348 F.3d 620, 624 (7th Cir. 2003); see also *Schmuck v. United States*, 489 U.S. 705, 716 n.8 (1989). We review the first step of the inquiry *de novo* and the second step for an abuse of discretion. *McCullough*, 348 F.3d at 624. Everybody agrees that the elements of simple possession are a subset of possession with the intent to distribute, and so our focus is on the second step of the inquiry. At issue is whether the element that distinguishes the lesser crime from the greater—the intent to distribute—is "sufficiently in dispute." *United States v. Chrismon,* 965 F.2d 1465, 1476 (7th Cir. 1992) (internal citations omitted).

The district court concluded that "given the large quantity of marijuana in the truck, no reasonable jury could infer that the defendants possessed the marijuana for anything other than to distribute." The court also observed that Lara's failure to say that he possessed the marijuana for personal use meant that the only plausible alternative was distribution. We cannot agree. This line of

reasoning, which the government pursues on appeal, presumes that a person can do only one of two things with marijuana in her possession: consume it or sell it. Of course it is preposterous to think that anyone could personally use a ton of marijuana, and Lara makes no such argument; to the contrary, he says that he is not a drug user. We thus agree with the district court that the personal use option is off the table. But the record in Lara's case plainly suggests another alternative: abandonment. Lara unloaded the truck following persistent requests from government agents to get the cargo out of the truck, reinforced by a government-induced appeal from his landlord to comply. After unloading the marijuana, Lara walked away empty-handed. A jury could have found that he was indifferent to what happened next: it could have stayed there for days, it could have been rained on, it could have been stolen, or the police could have collected it.

The government responds by pointing to *Chrismon* and *United States v. Hernandez*, 330 F.3d 964 (7th Cir. 2003), in support of its argument that when a defendant possesses a large quantity of drugs and does not intend to use it, she must intend to distribute it. A closer look, however, reveals that neither *Chrismon* nor *Hernandez* supports the government's view. In *Chrismon* police raided what was indisputably a stash house guarded by attack dogs. There, officers found a triple-beam scale, weapons, two boxes of small envelopes, a plastic bag filled with 120 small envelopes packed with drugs, a police scanner, and a screen that was hooked up to a camera monitoring the outside of the house. Based on those facts, and "in light

of the undisputed evidence that the trailer was a heavily armed and guarded marijuana retail outlet staffed by employees in shifts," we said that "no rational jury could find that [the defendants] were present in the trailer and in possession of the small packets of marijuana, but did not intend to distribute that marijuana." 965 F.2d at 1477. Our approach in *Chrismon* took into account all the circumstances, with a particular focus on the drug distribution paraphernalia recovered at the house, to conclude that distribution was the only plausible inference. Likewise, in *Hernandez*, the defendants were confirmed gang members who ran an elaborate drug-distribution ring out of a Chicago housing complex; the evidence at trial of a complex conspiracy to distribute drugs was overwhelming. See 330 F.3d at 972. Reviewing that record, we said that the defendants were not entitled to a lesser offense instruction because they "conceded to the district judge that they were not arguing that they possessed the drugs for their own personal use, and *no other reason for possessing them was given to the judge or produced at trial*." *Id.* (emphasis added). These cases do not stand for the proposition that when a defendant concedes she did not possess the drugs for personal use, the only possible inference is the intent to distribute.

The court should have considered whether evidence in the record would have permitted the jury to identify another plausible reason for possessing the drugs and thus to reject the government's allegation that he intended to distribute. We have no trouble concluding that Lara has pointed to such evidence here. Unlike in *Hernandez*, where the evidence of the larger conspiracy

to distribute was undisputed, the jury acquitted Lara on the conspiracy count. Absent an agreement with others to distribute the marijuana, a jury would have to infer that Lara intended to distribute some or all of it to find him guilty of the greater offense. Though a jury could draw that inference, the facts do not require it. And unlike in *Chrismon*, the authorities did not recover paraphernalia of the drug trade in Lara's possession, nor does the prosecution assert more broadly that it has any other evidence suggestive of Lara's involvement in drug distribution. So while the sheer quantity of drugs could support the distribution inference, a jury rationally could have concluded that Lara intended to abandon the marijuana after it was unloaded.

The court's failure to instruct the jury on the charge of simple possession was prejudicial error on these facts. This of course does not mean that every defendant who "abandons" his stash of drugs while in hot pursuit by police is entitled to a lesser offense instruction; our point is that the court must consider all of the facts of the case before making its ruling. If a defendant proposes a plausible argument that she did not intend to distribute the drugs, putting a key element "sufficiently in dispute," then she is entitled to the lesser offense instruction. See *Chrismon*, 965 F.2d at 1476.

2. Entrapment

Lara also asserts that he is entitled to acquittal because he was entrapped into his minor involvement with this crime. Entrapment involves "the apprehension of an

otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Jacobson v. United States*, 503 U.S. 540, 553-54 (1992). The defense has two elements: government inducement of the crime and a lack of predisposition on the part of the defendant. See *Mathews v. United States*, 485 U.S. 58, 63 (1988). (We have no need here to break the predisposition element down into "positional" and "dispositional" predisposition. See *United States v. Hollingsworth,* 27 F.3d 1196, 1200 (7th Cir. 1994) (*en banc*). We recognize that other circuits have either rejected or expressed skepticism about that distinction. See, *e.g., United States v. Ogle,* 328 F.3d 182, 188-89 (5th Cir. 2003); *United States v. Squillacote,* 221 F.3d 542, 567 (4th Cir. 2000); *United States v. Thickstun,* 110 F.3d 1394, 1398 (9th Cir. 1997). Lara's case depends on no such distinction, as we explain below.) In order to obtain an entrapment instruction, a defendant must proffer evidence on both elements. See *United States v. Santiago-Godinez*, 12 F.3d 722, 728 (7th Cir. 1993). Once a defendant meets this threshold, the burden shifts to the government to prove that the defendant was not entrapped, meaning "the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson*, 500 U.S. at 549. We review a district court's refusal to give an entrapment jury instruction *de novo*, *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010), bearing in mind that the question whether a defendant has been entrapped is "generally one for the jury, rather than for the court." *Mathews*, 485 U.S. at 63.

Lara contends that he is the quintessential "otherwise law-abiding citizen" who, absent the government's delivery of a ton of marijuana to his workplace, would never have run afoul of the law. The court initially thought that Lara's assertion that Agent Warran told him that the truck had to be unloaded might be enough to let him present the issue to the jury, but it reserved ruling on the matter. After hearing the evidence and considering the parties' arguments at the close of evidence, however, the court ruled that Lara failed to meet his burden. The court was persuaded by the government's argument that because the defendants failed to present evidence of "extraordinary inducement" by government agents, they were not entitled to an entrapment instruction. The court reasoned that Lara's concessions that Agent Warran had not threatened or made promises to him to induce his participation defeated his request for the instruction. (Gonzalez also argued entrapment; we consider his claim below.) As the court saw things, because Lara "was not forced to unload" the marijuana and he "could have walked away," no reasonable jury could have inferred that Lara was entrapped. The ruling also noted that, although there was some evidence that government agents forcefully insisted that Gonzalez unload the truck, these inducements were not directed at Lara and thus they were irrelevant to his defense. Because the court concluded that Lara failed to identify evidence that showed the government employed "extraordinary inducements," it never considered whether Lara was predisposed to commit the crime.

Several errors are evident in this analysis. We begin with the court's observations that because Lara "could have walked away" and was not "forced to unload," he was not entrapped. This line of reasoning troubles us, for it appears to confuse the defense of duress with that of entrapment. Lara has not asserted a duress defense; he does not claim that government agents put the proverbial gun to his head to force him to unload. See *United States v. Tanner*, 941 F.2d 574 (7th Cir. 1991) (holding that "duress is a defense only if the defendant reasonably feared immediate death or severe bodily injury which could be avoided only by committing the criminal act charged"). The government conceded at oral argument that there is a difference between duress and entrapment, yet counsel persisted with the argument that because Lara could have walked away, he was not entrapped. We disagree: an entrapment defense requires a showing of government inducement, not coercion. While coercion is sufficient to establish inducement, it is not necessary.

The parties vigorously dispute what the defendant must proffer to warrant an entrapment instruction. The district court thought that absent a showing of "extraordinary inducement," the inquiry ends. Before we explain why the court was wrong on this point, we pause to comment on the court's decision not to consider predisposition before making its final ruling. It is true that a defendant must proffer some evidence on both elements of the entrapment defense to warrant the instruction, but this is a situation in which the two parts of the inquiry inform one another. (We cannot become so enamored of a two-part test that we forget its ultimate point.) A per-

son's lack of predisposition to commit a crime distinctively reveals whether the government has ensnared "an unwary innocent" in a criminal enterprise of its own design. See *Mathews*, 485 U.S. at 63. As we explained in *United States v. Evans*, "the centrality of predisposition can be seen by considering the purpose of the doctrine of entrapment. It is to prevent the police from turning a law-abiding person into a criminal." See 924 F.2d 714, 717 (7th Cir. 1991). Thus, when the entrapment defense is in play, "predisposition . . . must be the key inquiry." *Id.*; *Mathews*, 485 U.S. at 63.

We recognize that where there is insufficient evidence of inducement—either because there is no such evidence at all, or because the government did nothing more than offer a standard market deal in a sting—there is no need to consider predisposition. But predisposition will often be the more efficient place to start. If the defendant can point to inducement from a sting, rather than become embroiled in the question whether the government offered only a standard deal or something much better, the court would do better to begin by considering predisposition to commit the crime. As we have noted before, if there is sufficient evidence that a defendant was predisposed to commit the crime, a request for an entrapment instruction may be rejected without considering government inducement. See *Santiago-Godinez*, 12 F.3d at 728. But the converse is not true: the court may not, as it did here, begin and end the inquiry with government inducement unless it is confident either that the government did nothing at all or that the record demonstrates that the government's actions simply provided an op-

portunity for a person who was already ready and willing to commit the offense.

There is an additional reason why it is sensible to begin the inquiry with predisposition. Whether a defendant is predisposed to commit the crime charged informs the nature and level of government inducement that must be identified to warrant an entrapment instruction. As we explained in *United States v. Hollingsworth*, 27 F.3d at 1200, when a defendant is so "situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so," then he may be required to point to "extraordinary inducements" to raise the entrapment defense. This rule makes sense, because it deters criminal suspects who have been properly targeted in a sting operation, such as a known gun dealer who distributes to the local street gang, from raising an entrapment defense when apprehended. When there is independent evidence that the person was predisposed to commit the crime charged, there is little risk that an innocent person has been transformed into a criminal by the government's presentation of an ordinary opportunity to engage in a particular criminal activity. See *United States v. De Marie*, 226 F.2d 783, 785 (7th Cir. 1955) ("Where the officers only furnished the defendant with an opportunity to carry out a crime which he was already willing to commit, there is no entrapment.").

We use the term "ordinary" in this context to mean something close to what unfolds when a sting operation

mirrors the customary execution of the crime charged. For example, federal agents offering to sell illegal guns to our hypothetical arms distributor at the going rate on the streets have simply created an "ordinary" inducement to commit the crime. In contrast, it would be "extraordinary" for the agents to approach the same person with an offer to sell as many guns as the buyer wanted for only one penny per piece. In the latter scenario, the defendant would be entitled to present an entrapment defense to the jury even though he was predisposed to buy guns, because the government employed extraordinary inducements to get him to commit the crime. This is because there is a good chance that the government's out-of-the-ordinary offer induced the buyer to purchase guns when he may have refrained from crime on that occasion. The entrapment defense resolves that concern by having the fact-finder determine whether the defendant was—based on the evidence presented at trial—entrapped. The upshot is that once a court has concluded that a person was predisposed to commit a crime, a defendant must do more to earn the instruction than assert that the government provided an ordinary opportunity to commit the crime; he must show extraordinary inducement.

Significantly, however, what we have set forth above does not exhaust the possible applications of the entrapment defense. The most important function of the doctrine, the one that the Supreme Court has repeatedly affirmed, is to ensure that people who are not predisposed to commit a crime are not transformed into criminals by the government. See, *e.g.*, *Sorrells v. United States*, 287 U.S. 435, 442 (1932) ("A different question is presented

when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute."); *Sherman v. United States*, 356 U.S. 369, 372 (1958) (observing that "a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal"). Suppose the rule was that every defendant, even one not predisposed to committing the crime charged, was required to make a showing of extraordinary inducement before the defense could be presented to the jury. Government agents would be free to target perfectly law-abiding individuals with inducements that are subtle, persistent, or persuasive—yet not extraordinary—and those individuals would never be able to present the entrapment defense to the jury.

The government supports such a rule, pointing to cases using the phrase "extraordinary inducements" in support. We recognize that many of our cases have used that phrase, *e.g.*, *United States v. Orr*, 622 F.3d 864, 869 (7th Cir. 2010), yet we caution against taking the adjective "extraordinary" out of context to divine a new legal standard. Our review of the cases confirms that the term "extraordinary inducement" has been used only in conjunction with a finding that the defendant was predisposed to commit the crime charged and thus had a higher burden to prove entrapment. See *Evans*, 924 F.2d at 717 ("Given Evans' propensities, it is probable that if the informant had not offered Evans a chance to buy marijuana in bulk, someone else would have done so, and that Evans would have accepted the offer . . . ."); *United States*

*v. Haddad*, 462 F.3d 783, 790 (7th Cir. 2006) ("Haddad was predisposed to trafficking in food stamps well before the CI approached him."); *Orr*, 622 F.3d 864, 869 ("Here, all factors indicate that Orr was predisposed to commit the charged offense."); *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010) ("The evidence presented in this trial showed beyond a dispute that Hall was predisposed to commit the crimes of which he was convicted."); *United States v. Millet*, 510 F.3d 668, 678 (7th Cir. 2007) ("Millet has failed to show that he lacked the predisposition to commit the crimes charged . . . ."). These cases stand for a proposition with which we have no quarrel: when the record reveals that a defendant was predisposed to commit the crimes charged, she is not entitled to an entrapment instruction unless she can show that the government provided an opportunity to commit the crime that was out of the ordinary. But if the evidence is thin that a defendant was predisposed to commit a crime, even minor government inducements should entitle the defendant to present her defense to the jury.

With these principles in mind, we consider Lara's claims. The government does not contend that Lara was predisposed to commit *any* crime, let alone the ones he was charged with following the sting operation. Rather, on appeal the government hews closely to the argument that prevailed below: because Lara failed to make a showing of extraordinary inducement, the court need not consider predisposition. We have already rejected that view. So we begin by asking whether Lara was predisposed to the crime charged: possession with the intent to distribute about one ton of marijuana. (We put the conspiracy charge to one side, because of the acquittal on that count.) This

requires an evaluation of the following five factors:
(1) the defendant's character or reputation; (2) whether
the government initially suggested the criminal activity;
(3) whether the defendant engaged in the criminal activity
for profit; (4) whether the defendant evidenced a reluc-
tance to commit the offense that was overcome by govern-
ment persuasion; and (5) the nature of the inducement or
persuasion by the government. *Hall*, 608 F.3d at 343. No
single factor controls, but most significant is whether
the defendant was reluctant to commit the offense. *Id*.

It is not surprising that the government spends no time
arguing that Lara was predisposed to commit the crime
charged, since even a cursory review of the record shows
no hint of such a predisposition. Indeed, this is a case
where we need not mechanically consider each factor
before concluding that a reasonable jury could infer that
Lara was not predisposed to commit the crime. Only a
few facts require mention: Lara was tending to his land-
scaping equipment when Agent Warran and his compan-
ion arrived with a truck chock-full of marijuana and
insisted that he unload it; Lara was not affiliated with
the cartel that shipped the marijuana, nor was he ac-
quainted with his co-defendants in this appeal prior to
the government's involvement; when Lara learned the
truck contained marijuana, he initially resisted the
request to help with the unloading and acquiesced only
after government's persistent efforts; and when the job
was done he promptly walked away empty-handed
without payment in drugs or money. Even the district
court noted Lara's "initial reluctance" to unload the
container (as a way to draw a contrast between Lara and

Gonzalez, who the court concluded was predisposed to commit the crime). We recognize that Lara possessed a pistol when he was arrested, but on these facts that detail does not significantly alter our analysis of whether he was predisposed to distributing the marijuana. (We note that gun ownership is common in our society.) We might view this fact differently if Lara was apprehended in the midst of a drug transaction. But here he was simply unloading a truck near his workplace. We are confident that Lara has easily met the threshold requirements for a chance to give the predisposition issue to the jury.

As for the element of government inducement, the facts are sufficient for a jury to infer that the government induced Lara to unload the truck. Agent Warran did more than simply drive the truck to the River Road address and patiently wait to see who volunteered to unload it. He insisted that Gonzalez round up others to help (hoping to get a bigger haul of criminals), and the only one who took part in the so-called controlled delivery who was eager to get involved was Gonzalez. As we noted, once Lara realized the truck was full of marijuana, he again hesitated to participate. During this time, Warran yelled obscenities urging the men to unload and fraudulently claimed that he could not leave the property until the cargo was unloaded. The court concluded that Warran's verbal efforts to hasten the unloading were directed at Gonzalez, not Lara, but we think that this shaves the facts too finely. Government counsel conceded that the statements were made in the presence of Gonzalez, Lara, and the other men who were standing around; it is unrealistic to think that Warran's performance had no effect on

Lara. We note one final point that the district court appears to have discounted. Government agents had previously contacted Doc Roberts, Lara's landlord, about the controlled delivery. Roberts was paid $1,000 for his cooperation in the affair; this payment, government counsel conceded at oral argument, makes him a government agent. In an effort to secure Lara's participation in the unloading, Warran again contacted Doc Roberts to persuade Lara to unload. Warran then told Lara that Doc Roberts said it was all right to unload the shipment and he would take responsibility for whatever happened. Based on these facts, we conclude that Lara has identified enough evidence in the record from which a jury could conclude that the government induced him to commit the crime.

So Lara is also entitled to a new trial based on the entrapment defense. In that proceeding, prosecutors will bear the burden to prove beyond a reasonable doubt that Lara was predisposed to committing the crime by identifying "preinvestigation evidence" bearing on this issue. See *Jacobson*, 503 U.S. at 548-49 ("Where the Government has induced an individual to break the law and the defense of entrapment is at issue, as it was in this case, the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents."). We stop short, however, of holding that Lara is entitled to a judgment of acquittal based on a finding that he was entrapped as a matter of law. The district court approached this case with a mistaken understanding of the relevant legal standards. Because of that error, the

record was not developed properly, nor did the district court make its ruling with the proper principles in mind. On remand, the district court should consider the question anew based on the record presented to the second jury. After those proceedings are completed, Lara will naturally have all avenues of appeal available to him. We need not address Lara's sentencing arguments given our conclusion that Lara is entitled to a new trial on two independent grounds.

### B. Irineo Gonzalez

Like Lara, Gonzalez contends that he was entitled to an entrapment instruction. Unlike Lara, however, Gonzalez's argument fails. The district court assumed that even if Gonzalez could satisfy the inducement element, he was nevertheless predisposed to commit the crime and thus cannot avail himself of the defense. We agree with that assessment. The record does not support Gonzalez's contention that he was an unwary innocent in this affair. Although Gonzalez's connection to the owners of the shipment is unclear, the record shows that he arrived at the River Road address on the night of March 25 in order to receive the cargo. He exhibited not a shred of reluctance to commit the crime at that time. See *Santiago-Godinez*, 12 F.3d at 728 (identifying reluctance to commit the crime as the most important part of the inquiry). To the contrary, he pleaded with Agent Warran to let him unload the truck single-handedly that night. It was only at Warran's insistence that he left that night empty-handed. Gonzalez then arrived the next day prepared yet again to receive the contraband.

Other evidence also points to Gonzalez's predisposition to commit the crimes charged: he was in contact with unknown persons in Jalisco, Mexico, during the period when he was trying to get the truck unloaded; after he was unable to unload the truck the first night, he paid Warran and Nardo to return the next day; and he or Pillado registered the cargo van in the name of "Alfonso Huerta." It is true, as Gonzalez points out, that there is little unfavorable evidence relating to his character or reputation. But this fact alone does not support an entrapment instruction, particularly since the record reveals that Gonzalez had only been in the United States for a few months before his arrest. Indeed, the court concluded that Gonzalez came to Chicago for the specific purpose of receiving the cargo. In any event, what is most important for our inquiry is that Gonzalez would have arrived to collect the shipment even without the involvement of government agents. Thus, the district court correctly concluded that Gonzalez was not entitled to an entrapment instruction.

Next, Gonzalez complains that he was not permitted to introduce certain recorded statements made by Warran during the sting operation. Gonzalez faces an insurmountable hurdle with this argument because he fails to identify which recorded statements he sought to admit, why the court excluded them, and why he believes the court's decision was in error. His failure to develop his argument properly makes it impossible for us meaningfully to review his claim. We therefore conclude that these arguments are forfeited. See *Roland v. Langlois*, 945 F.2d

956, 963 (7th Cir. 1991) ("An appellate court reviews arguments, it does not construct them.").

Finally, Gonzalez challenges the four-level enhancement imposed pursuant to U.S.S.G. § 3B1.1(a) for being the leader or organizer of a conspiracy that includes five or more participants. We review a district court's factual findings supporting an offense level for clear error. Explaining its reasoning, the district court concluded that the enhancement was proper because Gonzalez led a criminal enterprise that included five participants, including his codefendants in this appeal, Pillado and Lara. Considering the factors outlined by the guidelines, the court observed that Gonzalez exercised decisionmaking authority by paying the driver, signing for the shipment, recruiting accomplices, and paying at least two of them with bricks of marijuana. In the court's view, those actions are consistent with a leadership role.

Gonzalez takes issue with several aspects of the district court's analysis. First, he emphasizes that he arrived alone to unload the shipment, and it was Agent Warran who insisted that he return the next day with accomplices. When he returned, he still had not recruited others to help with the task, which is why he ultimately turned to Lara, Hernandez, and Morales, who much to their detriment happened to be working there that day. Gonzalez concedes that he paid Hernandez and Morales to unload, but he asserts that he did not lead them sufficiently to warrant the four-level enhancement. He also stresses that Lara unloaded at his own discretion without direction from Gonzalez, presumably as a favor to his landlord.

Though Gonzalez's arguments are not frivolous, we cannot conclude that the district court's factual findings regarding Gonzalez's role in the offense were clearly erroneous. *United States v. Matthews*, 222 F.3d 307 ("If the fact finder chooses between two permissible views of the evidence, the choice is not clearly erroneous."). Nevertheless, our analysis of the entrapment defense as it applies to Lara requires a remand to the district court for a reconsideration of Gonzalez's sentence. The four-level enhancement pursuant to § 3B1.1(a) is premised on Gonzalez's leadership of a conspiracy that purportedly involved five or more people, and the court explicitly based the enhancement on this fact. If, however, Lara was entrapped into committing the conduct for which he is charged, the number of participants drops from five to four. We recognize that application note 1 says that a "participant" need not have been convicted, but it goes on to say that a "person who is not criminally responsible for the commission of the offense (*e.g.*, an undercover law enforcement officer) is not a participant." U.S.S.G. § 3B1.1, application note 1. A defendant who prevails on an entrapment defense is not criminally liable for her role in the offense, even though she plainly committed the underlying conduct. See *United States v. DeLeon*, 603 F.3d 397, 407-08 (7th Cir. 2010) (discussing, in the context of U.S.S.G. § 3E1.1, how an entrapment defense "tends to negate an acceptance of responsibility"). So we remand to the district court for a reconsideration of whether the four-level enhancement is warranted in light of our discussion of Lara's entrapment defense, or if Gonzalez's sentence is otherwise supportable as a matter of discretion. See 18 U.S.C. § 3553(a).

Because we are remanding for reconsideration, we call the district court's attention to one final point. If Agent Warran had not refused to let Gonzalez unload the truck alone on March 25, as the government's recordings plainly indicate Gonzalez planned to do, Hernandez, Morales, and Lara would not have become involved in this regrettable affair. Absent their involvement, the four-level enhancement would be plainly inapplicable. We note as well that the court gave Morales, Lara, and Hernandez mitigating role reductions, reflecting the court's assessment that these three defendants were less culpable than the average participant in this sort of criminal enterprise. Although our standard of review on appeal prevents us from directing the district court to re-open fact-finding on this issue, we invite the district court to reconsider this point on remand in the interest of justice. See *United States v. Johnson*, 643 F.3d 545, 554 (7th Cir. 2011).

### C. Israel Pillado

Finally, we turn to Israel Pillado. Pillado begins by arguing that the district court erred in denying his motion to suppress his post-arrest statements based on *Miranda v. Arizona*, 384 U.S. 436 (1966). "Central to *Miranda*'s holding is that law enforcement officers are obliged to inform an accused who is subject to custodial interrogation that she has the right to consult an attorney and to have an attorney present during questioning." *United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009). One consequence of this rule is that when "a suspect invokes her

*Miranda* rights, she 'is not subject to further interrogation by the authorities until counsel has been made available . . . unless the accused [herself] initiates further communication, exchanges, or conversations with the police.'" *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). In reviewing a denial on a motion to suppress, we review questions of law *de novo* and questions of fact for clear error, "giving special deference to the district court's superior vantage point on matters of witness credibility*." United States v. Whited*, 539 F.3d 693, 697 (7th Cir. 2008).

Pillado says that he asked to speak to an attorney once he was arrested, but Agent Warran's and Officer Gutierrez's testimony at the suppression hearing squarely contradicted this assertion. Pillado does not dispute that he was read and understood his *Miranda* rights, or that his statements to the authorities were voluntary. His argument therefore turns on who was telling the truth at the suppression hearing. This is plainly something for which the district court was in a better position to judge than we are. Pillado nonetheless asserts that the court's decision to credit the testimony of the government agents was clearly erroneous. In support, he points to one inconsistency between the testimony of Warran and Gutierrez, and suggests that the agents had a motive to fabricate their testimony because they are friends and had a shared interest to "protect their arrest." These arguments do not warrant overturning credibility determinations of the district court.

Next Pillado argues that the evidence was insufficient to support his conviction on both counts. Upon review, we

consider the evidence in the light most favorable to the government and will reverse only if no rational juror could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Sanchez*, 615 F.3d 836, 842 (7th Cir. 2010). Pillado insists that his role in this affair was tangential, limited to driving Gonzalez to McHenry and returning to pick him up later. He emphasizes that he spent no more than 10 to 15 minutes at the scene of the crime and, unlike the other defendants, did not participate in unloading the marijuana. Indeed, he asserts that he did not even know what was in the truck, though he suspected that it was something illegal. He further points out that when he was arrested on his way back to Chicago, he had no money, weapons, or drugs in his possession, suggesting that he had not gained anything of value from his involvement. Based on these facts, Pillado says that the evidence is insufficient to sustain a conspiracy conviction, and without the conspiracy charge the possession with intent to distribute charge must also be reversed.

We can imagine that Pillado got more than he bargained for when he agreed to drive Gonzalez to McHenry. The evidence showing that Pillado entered into an agreement with Gonzalez or anyone else to distribute 943 kilos of marijuana is less than overwhelming. Were we the fact-finders in this case, it is possible that we would have drawn different inferences from the evidence presented. But the standard of review requires us to limit our analysis to the question whether it was reasonable for the jury to convict, viewing the evidence in the light most favorable to the government. While Pillado argues

that he was essentially no more than a chauffeur for Gonzalez, the record permits a more incriminating inference.

The evidence showed that Pillado had recently purchased a cargo van. A reasonable juror could infer, as the government argued, that the van was intended to transport the marijuana. Pillado's professed inability to recall from whom he bought the van, even though it was a recent purchase, casts serious doubt on his credibility. What is more, after he picked up Gonzalez, the two drove to a currency exchange to get license plates for the van and one of them went inside and registered the van to "Alfonso Huerta" at Pillado's address. The jury was entitled to believe Pillado was responsible for this action. Additionally, when Warran called Gonzalez's cell phone, Pillado spoke to him claiming to be "Hector." He also provided inconsistent explanations for why he returned to the River Road address after leaving. Phone records also show that on the day he was arrested, Pillado was in contact with Gomez, who drove Gonzalez to the River Road address on March 25, further suggesting a link between the suspects. Although Pillado presents an alternate narrative explaining some of these facts innocuously, that is of little help given the standard of review. Therefore we reject his insufficiency argument.

The last issues before us relate to Pillado's sentence, which he challenges on four grounds. Pillado contends that the district court erred in finding that he obstructed justice, in denying his request for a reduction based on his role in the offense, and in declining to apply the "safety

valve" to his sentence. These three arguments bear directly on the court's calculation of the proper guidelines range. Pillado also contends that his sentence is unreasonable.

Without making any exceptions, the court adopted the pre-sentence report, which put Pillado at an offense level of 32, based on an initial level of 30 with a two-point enhancement for obstruction of justice. Pillado had zero criminal history points, placing him in criminal history category I. The court calculated the guidelines range, 121 to 151 months, and ultimately sentenced him to 150 months in prison. We begin with Pillado's argument that the court erroneously enhanced his sentence pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. As the district court saw things, Pillado lied at the suppression hearing when he claimed to have requested an attorney after waiving his *Miranda* rights. We have already concluded that this finding was not clearly erroneous, and so we accordingly conclude that the two-level enhancement was proper. See *United States v. Freitag*, 230 F.3d 1019, 1026 (7th Cir. 2000) (upholding obstruction enhancement for perjury).

The court also believed that Pillado failed to take responsibility for what was a central role in the drug conspiracy and that he was not truthful with the government during his "safety valve" proffer. On these points, the sentencing judge specifically concluded: "It's significant to me that not only does the defendant fail to accept responsibility, he continues to insist that he was nothing more than an innocent bystander in this chain of events. I believe, I'm convinced that he was a willing and principal

participant in this criminal enterprise. I know it, the
defendant knows it, and to claim otherwise I believe is
deceitful and disingenuous." Based on these findings,
which we cannot conclude were clearly erroneous, the
court did not err in denying Pillado reductions for his
role in the offense pursuant to § 3B1.2 or the "safety
valve" pursuant to § 5C1.2.

Finally, Pillado also sought a variance from the guide-
lines range down to the statutory minimum based on
the § 3553(a) factors. He does not contend that the court
committed a procedural error in calculating the guide-
lines range; rather he believes that he should have been
sentenced to a shorter prison term. This is an argument
that his sentence is substantively unreasonable. We
presume that a sentence within the guidelines range is
reasonable. *Rita v. United States*, 551 U.S. 338, 347 (2007).
The court considered the defendant's age at the time of
the offense (20 years old) and his lack of a criminal history
as mitigating factors, but it went on to conclude that he
"has led far from [] a law-abiding life . . . ." The court
observed that the defendant was in the United States in
violation of the immigration laws, and he had committed
other crimes, including using false names on registra-
tions and obtaining false identifications to conceal his
undocumented status. In addition, the court emphasized
the huge quantity of drugs involved in the crime, and his
central role in the offense. Because the court properly
addressed the 3553(a) factors in the process of determining
a within-guidelines sentence, we conclude the court did
not abuse its discretion.

For the reasons stated above, we REVERSE Lara's conviction and REMAND for a new trial consistent with this opinion. We AFFIRM Gonzalez's conviction but VACATE his sentence and REMAND for reconsideration. We AFFIRM the judgment of conviction and sentence of the district court in Pillado's case.