POSNER, Circuit Judge,
concurring and dissenting.
I join the court’s opinion affirming the convictions and sentences of Kindle and White. But Mayfield is entitled to a new trial. A reasonable jury could find that he had been entrapped, and so the district judge should have instructed the jury on entrapment rather than barring the defendant from presenting an entrapment defense.
The defense is unusual. Ordinarily the burden of persuasion with respect to an affirmative defense is on the defendant. But if the defendant persuades the district court that a reasonable jury could find that he had been entrapped, the judge must submit the defense to the jury with an instruction that, to convict, the jury must find beyond a reasonable doubt that the defendant was not entrapped. Jacobson v. United States, 503 U.S. 540, 549, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992); United States v. Pillado, 656 F.3d 754, 763 (7th Cir.2011). There was enough evidence of entrapment in this case to require the judge to give such an instruction.
We should distinguish among three cases in which the police create an opportunity for someone to commit a crime and he does so. I will illustrate with bicycle theft. In case number one, a man is a known bicycle thief or strongly suspected of being one. The police place an unlocked bicycle in an area known to be frequented by him. Sure enough he sees the bike, sees that it’s unlocked, rides off on it — and is promptly arrested by police officers who had been watching the bicycle, unobserved, from afar. In such a case there is no entrapment. The police arranged for the suspect to commit his usual crime, only in circumstances in which it would be easy to *413 apprehend and convict him. “It would be a case in which the government had merely furnished the opportunity to commit the crime to someone already predisposed to commit it.... The government’s inducement affects the timing of the offense; it does not create the offense by exploiting the susceptibilities of a weak-minded person.” United States v. Hollingsworth, 27 F.3d 1196, 1203 (7th Cir.1994) (en banc). “[T]he inducement which brought about the actual offence was no more than one instance of the kind of conduct in which the accused was prepared to engage; and the prosecution has not seduced an innocent person, but has only provided the means for the accused to realize his preexisting purpose.” United States v. Sherman, 200 F.2d 880, 882 (2d Cir.1952) (L. Hand, J.).
In case number two, a man is known to the police to have been a bicycle thief, but that was years ago and he’s gone straight and become respectable. But they want an easy conviction so they arrange an extraordinary inducement. Pretending to be bicycle thieves they tell him they’ll pay him $1,000 to help them steal a bike that they describe as unusually valuable. He agrees. He had never made a profit of more than $50 per bike when he was a bicycle thief. And he needs money because, given his criminal record, he has been unable to obtain a job that pays a decent wage. The police stage the theft and then arrest him. That is entrapment. Jacobson v. United States, supra, 503 U.S. at 553-54, 112 S.Ct. 1535; United States v. Hollingsworth, supra, 27 F.3d at 1199-1200. He would not, as far as anyone knows, have ever committed another bicycle theft had the police not confronted him with an opportunity far more lucrative than any he had encountered in his now abandoned criminal career. The police have thus caused an increase in the number of bicycle thefts, whereas in the first case they reduced the number of bicycle thefts by terminating a bicycle thief s career, though it would be more accurate to say that the sting in the first case may well have reduced the number of bicycle thefts; the reason for the qualification is that once the thief is taken out of circulation some formerly law-abiding person may decide to fill the resulting gap in the ranks of bicycle thieves.
In case number three, the police know the man has stopped stealing bikes only out of fear of being caught, and hence that he remains “predisposed” to steal bikes if circumstances improve. So they arrange the same type of sting as in case number two, rightly confident that even if he’d given up stealing bikes he can be enticed by a promise of $1,000 to steal one more. And he does. There can be no confidence that had there been no such extraordinary inducement he nevertheless would have committed the theft. Often cases say that extraordinary inducements create entrapment even if the defendant was predisposed to commit the crime. But really what extraordinary inducements do is show that the defendant’s commission of the crime for which he’s being prosecuted is not reliable evidence that he was predisposed to commit it. Thus, “inducement is significant chiefly as evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question.” United States v. Hollingsworth, supra, 27 F.3d at 1200. In contrast, an inducement is “ordinary” when it is “something close to what unfolds when a sting operation mirrors the customary execution of the crime charged.” United States v. Pillado, supra, 656 F.3d at 765; see also United States v. Sherman, supra, 200 F.2d at 882.
*414 A reasonable jury could have fit May-field’s case to our hypothetical second or third cases had it been permitted to consider an entrapment defense. So far as appears, he had never robbed a stash house. It’s true that after agreeing to participate in the stash-house robbery he bragged to the government’s undercover agent that he had robbed stash houses. But he may just have been trying to reassure the agent, who was to lead the robbers into the stash house (the agent pretended to be a drug courier for the house), that he (Mayfield) was competent to participate in such a dangerous undertaking. He had never even been convicted of a drug offense, and there is no evidence, other than his boasting, that he was dealing drugs when approached by the undercover agent. The jury could also have found that Mayfield’s last major criminal act (an armed robbery not involving drugs) had occurred in the early 1990s; that when released from prison in 2005, four years before he agreed to rob the imaginary stash house, he had tried to go straight— moving away from the city in which he’d lived and had had criminal associates and getting a legal job. He had earned his GED, an associate’s degree, and three vocational certificates in prison, and upon release had devoted personal time to volunteer activities. There is no evidence that he had committed any more robberies. He was 41 at the time of the sting, an age at which many criminals have aged out of violent crimes.
These were all facts for the jury to weigh (but the jury was not allowed to do so). The jury could have found that the defendant had not been predisposed to rob a stash house. It could have found this even if it thought him predisposed to commit armed robberies, for he was offered an extraordinary inducement to rob the imaginary stash house. Most robberies, even bank robberies, net little money for the robber. But a stash house is a potential goldmine. The informant told Mayfield that there were 25 to 35 kilograms of cocaine in the stash house. The cocaine was to be divided evenly among him, his three associates, and the instigator. This would net him 5 to 7 kilograms of cocaine, with a street value of $135,000 to $189,000. The potential gain, coupled with the informant’s eagerness to betray his supposed employers by revealing the location of the stash house, created an inducement to commit a crime that, so far as appears, was unlike any that Mayfield had ever committed, or that he would ever have committed had it not been for the sting.
The inducement would not have been thought extraordinary by a stash house robber. If that is what Mayfield was, he would have been predisposed to accept the informant’s offer. But a reasonable jury could have found that he was not a stash house robber, or even a drug dealer of any sort, was not predisposed to attempt a stash house robbery, and accepted the invitation because of financial desperation.
Not all fictitious stash house stings justify an entrapment instruction, even though such stings are a disreputable tactic. Law enforcement uses them to increase the amount of drugs that can be attributed to the persons stung, so as to jack up then-sentences. Eda Katharine Tinto, “Undercover Policing, Overstated Culpability” 51-52 (NYU School of Law, Public Law Research Paper No. 12-04, August 2012; forthcoming in Cardozo Law Review, vol. 34, 2013), http://papers.ssrn.com/sol3/ papers.cfm?abstract_id=2016362 (visited Sept. 4, 2012). And such stings create an increased risk of entrapment because of “the potential for the extensive use of inducements and unrealistic temptations to encourage the suspects’ criminal conduct.” Id. at 52; see also United States v. Briggs, 623 F.3d 724, 729-30 (9th Cir.2010). *415 “[T]he government can ‘minimize the obstacles a defendant must overcome to obtain the drugs.’ For example, the police can convince a suspect that the stash house robbery would be a shockingly simple and easy crime to commit and can provide items, such as a car, needed to complete the crime.” Tinto, supra, at 52-53. Nevertheless I accept the rejection of an entrapment defense in the superficially similar case of United States v. Hall, 608 F.3d 340, 343-44 (7th Cir.2010). The court thought the defendant predisposed to rob a stash house, and the expected profit to him seemed modest, which was evidence of predisposition. The evidence of predisposition in this case is altogether thinner.
The government’s major argument is that Mayfield’s wholehearted commitment to the scheme once he decided to join proves predisposition — the government’s brief barely mentions events before he agreed to participate in the robbery. But it is hardly surprising that having yielded to an extraordinary inducement he would do everything possible to earn the promised reward. If the defendant “was indeed entrapped, it is irrelevant that the entrapment was so effective as to make him not only a willing but an eager participant.” United States v. Evans, 924 F.2d 714, 716 (7th Cir.1991); cf. Sherman v. United States, 356 U.S. 369, 373-74, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (the same defendant as in Judge Hand’s case, which I cited earlier, but a subsequent appeal). Moreover, robbing a stash house is a dangerous business; the undercover agent told May-field that the robbers would encounter three armed men inside, who would kill to thwart a robbery. It was natural that Mayfield should seek to reduce the danger to himself by recruiting associates.
It’s not as if he’d agreed to the scheme when the felon who was working for the police as an informant on a commission basis first proposed it to him. The informant, a coworker, knew Mayfield had a criminal past, and may have thought him likely to be persuadable to commit a crime because he expressed concern about his low wage. According to Mayfield, the informant’s first suggestion was that May-field join him in selling cocaine. He refused. Next the informant told him that his (the informant’s) drug supplier (actually it was a government undercover agent for whom the informant worked) wanted to rob a stash house and that if Mayfield joined in the caper he would earn tens of thousands of dollars. Again Mayfield refused. The informant kept badgering him, without success. Then Mayfield’s car was damaged in an accident, and he didn’t have enough money to repair it. The informant lent him $180 — and kept on badgering him to join in robbing the stash house. The informant pointed to the Gangster Disciples tattoo on Mayfield’s arm and said that he (the informant) was still connected with the gang; a reasonable jury could have accepted Mayfield’s claim that he thought the informant was warning him that he’d better repay the $180 — or else. He couldn’t repay it without the proceeds of the stash-house robbery. So finally he caved, and agreed to join the scheme. The majority opinion omits these critical facts.
Mayfield’s prolonged initial reluctance, which appears to have lasted for weeks, suggests that he wasn’t eagerly awaiting an opportunity to resume his abandoned life of crime. It was only when his need for money became acute and he feared that a failure to pay his debt to the informant would place his life in danger that the lure of participating in a robbery that would net him a large amount of money became irresistible. Or so at least the jury might have found had it been allowed to consider his entrapment defense.
Criminals do sometimes change and get their lives back on track and we don’t want *416 the government pushing them back into a life of crime. Sherman v. United States, supra, 356 U.S. at 375-76, 78 S.Ct. 819. This may be a case like Sherman in which “the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted.” Id. at 376, 78 S.Ct. 819 (footnote omitted). Sherman like Mayfield had a criminal record but was trying to go straight.
I do not say that Mayfield was entrapped. But there is considerable evidence that he may have been, and, considering the stakes (he was sentenced to 322 months in prison, close to a life sentence given his age), he was entitled to present an entrapment defense to the jury. The government would have had a heavy burden of disproving the defense.
In closing I want to say something about the sentence and about the. criticized practice of fictitious stash house stings; these are related. I cannot imagine the sense of imprisoning Mayfield for 27 years (minus modest good-time credit if he behaves himself). I should think a sentence of 5 years more than adequate. Can there be any serious concern that upon emerging he would embark on a career of robbing stash houses? That if approached by anyone inviting him to launch such a career he would listen to the person? Is there anything in the record to make such a possibility real? Before succumbing to the blandishments of the informant, Mayfield was working at an honest job. He was supporting himself. He was not a public charge. Now, as a result of the sting, we the taxpayers will be supporting him at considerable expense for the next quarter century. Does that make any sense?
And now consider the role of such stings in the “war on drugs.” Are they likely to reduce the sale and use of illegal drugs? No; they are likely to have the opposite effect. Stash house robbers do not increase the amount of drugs in circulation, since they steal their drugs instead of making or importing them. The effect of a fictitious stash house sting, when the person stung is, unlike Mayfield, a real stash house robber, is therefore to make stash houses more secure by reducing the likelihood of their being robbed. A sting both eliminates one potential stash house robber (unless the defendant was entrapped) and deters other criminals from joining stash house robberies, since they may turn out to be stings. The greater security that fictitious stash house stings confer on real stash houses — security obtained at no cost to the operators of stash houses — reduces their cost of self-protection, which is a principal cost of the illegal-drug business. The lower a business’s costs, the lower the prices charged consumers, and so the greater the demand for illegal drugs and the more sales and consumption of them. The operators of stash houses would pay law enforcement to sting potential stash house robbers.