In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1160

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MELVIN D. VAN ALLEN, JR.,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 914—**David H. Coar**, *Judge.*

———————

ARGUED NOVEMBER 26, 2007—DECIDED APRIL 29, 2008

———————

Before BAUER, ROVNER and WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* Melvin Van Allen was convicted of a series of financial crimes involving the structuring of currency transactions and the concealment of assets in a bankruptcy proceeding, in violation of 18 U.S.C. §§ 152(1) and (2) and 31 U.S.C. §§ 5324(a)(3) and (d)(2). On appeal, Van Allen challenges the sufficiency of the evidence supporting the convictions on several counts, an evidentiary ruling by the district court, and two of the jury instructions. For the following reasons, we affirm Van Allen's conviction.

**I. Background**

Van Allen, erstwhile mayor of the Village of Justice, Illinois, made a living in the used auto parts business, purchasing parts from junkyards and reselling then to auto rebuilders. Van Allen ran the unincorporated operation with the help of his three sons, Melvin III, Zachary, and Joshua. In running the business, Van Allen maintained several bank accounts. The primary account used in Van Allen's transactions was with Archer Bank in Chicago, and was in the name of Van Allen and his wife "doing business as Treyzack Trailers." The Van Allens also had joint accounts at TCF National Bank and Bridgeview Bank and Trust.

Between 2002 and 2004, Van Allen wrote more than 3,000 checks on the Archer account. Most of the checks were made out to himself, though several were made out to his wife or one of his three sons. All of the checks were cashed, mostly at a currency exchange which would charge a processing fee. This business practice stemmed (or so Van Allen claimed) from the nature of the used auto parts business: Van Allen's suppliers dealt exclusively in cash, and Van Allen would write checks that he expected to be sufficient to cover each day's purchase of parts. Van Allen's customers, on the other hand, paid primarily by check. Instead of depositing these checks directly into the Archer account, the Van Allens would cash the checks at the currency exchange and then deposit the cash into the account, so that the cash would be immediately available. As Van Allen would explain to an F.B.I. agent, he engaged in these somewhat circuitous practices in order to "avoid the aggravation" of filing extra paperwork.

Notably, though checks written by Van Allen between 2002 and 2004 totaled over $5.8 million, none of the 3,000

checks exceeded $10,000. At the same time that Van Allen wrote and cashed these checks, he made hundreds of cash deposits into the Archer account, also conspicuously under the $10,000 amount. In 2003 and the first half of 2004, the Van Allen family made 1,148 separate cash deposits totaling over $5.5 million into the Archer account, and all but three of these deposits were in amounts under $10,000. The amount of money involved in these transactions tracked the federal law that requires banks and currency exchanges to report currency transactions over $10,000 to the IRS; structuring transactions to evade this requirement violates federal law.

Though the Van Allens moved millions of dollars in cash through the auto parts business, by mid-2003, the Van Allens encountered significant financial difficulties. On August 9, 2003, the Van Allens met with Christine Piesiecki, an attorney, to discuss the possibility of one or both of the Van Allens entering into bankruptcy. The Van Allens presented several documents to Piesiecki and disclosed information regarding their business troubles and financial instability—though Piesiecki and the Van Allens disagree as to the nature and extent of those disclosures.

On January 10, 2004, Van Allen informed Piesiecki that he had decided to file for bankruptcy. Piesiecki prepared the bankruptcy petition and schedules, which Van Allen reviewed, certified, and signed. Piesiecki filed the petition and schedules on January 28, 2004.

Van Allen's bankruptcy petition omitted some key facts about his financial status. The bankruptcy schedules failed to disclose several of his assets, including his ownership interest in his home, the Bridgeview account, and the TCF account. He also failed to disclose that he

operated the auto parts business in the two years leading up to the bankruptcy filing, or that he obtained any income from the business.

After filing for bankruptcy, Van Allen attended a statutorily-required meeting of the creditors on May 10, 2004. With the bankruptcy trustee presiding, Van Allen stated under oath that he did not own his home and that he had listed all of his assets in his bankruptcy petition. Both statements were false. In reliance on these statements and the bankruptcy petition, the bankruptcy trustee filed a report that allowed Van Allen to discharge all of his credit card debt.

Van Allen was charged with four bankruptcy-related offenses, including three counts of concealment of assets under 18 U.S.C. § 152(1) and one count of making false statements to a trustee during a trustee meeting under 18 U.S.C. § 152(2). Van Allen was also charged with twenty-eight counts of illegal structuring, including twenty-five counts of structuring cash deposits at Archer Bank (Counts Five through Twenty-Nine) and three counts of structuring currency transactions at the currency exchanges (Counts Thirty through Thirty-Three), all in violation of 31 U.S.C. §§ 5324(a)(3) and (d)(2). A jury convicted Van Allen on all counts, and he was sentenced to thirty-six months' imprisonment and two years' supervised release.

## II. Discussion

Van Allen raises several issues on appeal: (1) that the government failed to present evidence sufficient to convict Van Allen on the structuring counts; (2) that the government failed to present evidence sufficient to con-

vict Van Allen on one of the bankruptcy-related counts; (3) that the district court erred in denying an advice-of-counsel jury instruction; (4) that the jury was improperly instructed on what constitutes "concealment" for the concealment of assets in a bankruptcy proceedings count; and (5) that the district court erred in excluding evidence showing that the banks actually filed transaction reports for several of allegedly evasive currency transactions. We address each issue in turn.

## A. Sufficiency of Evidence of Illegal Structuring

Van Allen argues that the government failed to present sufficient evidence with respect to Counts Five through Twenty-Nine for illegal structuring. Normally, "when a defendant challenges his conviction based on the sufficiency of the evidence, we ask only whether, when viewed in the light most favorable to the Government, the evidence was sufficient 'to allow a rational trier of fact to find all of the essential elements of an offense beyond a reasonable doubt.'" *United States v. Whitlow,* 381 F.3d 679, 684-85 (7th Cir. 2004) (quoting *United States v. Owens*, 301 F.3d 521, 528 (7th Cir. 2002)). However, because Van Allen did not move for acquittal either at the close of evidence or in a post-trial motion, he failed to preserve this issue for review, and we review for plain error. *Id.* at 685. Under the plain error standard, the party asserting the error must establish (1) that there was in fact an error; (2) that the error was plain; and (3) that the error "affects substantial rights." *United States v. Jumah,* 493 F.3d 868, 875 (7th Cir. 2007) (quoting *United States v. Olano*, 507 U.S. 725, 732-34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). We will not exercise our discretion to consider the error unless it "seriously affect[s] the fairness, integrity or

public reputation of judicial proceedings." *Id.* (quoting *Olano*, 507 U.S. at 732, 113 S.Ct. 1770) (internal quotation marks omitted). Under this "most demanding standard, reversal is warranted only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element was so tenuous that a conviction would be shocking." *United States v. Beaver*, 515 F.3d 730, 741-42 (7th Cir. 2008) (internal quotations and citation omitted). Ultimately, Van Allen can prevail only if failing to reverse results in "a manifest miscarriage of justice." *Id*. at 741.

Under regulations promulgated by the Treasury Department, banks and currency exchanges must file a report with the IRS every time a customer makes a "deposit, withdrawal, exchange of currency or other payment or transfer . . . which involves a transaction in currency of more than $10,000." 31 C.F.R. § 103.22(b)(1). This report is known as a Currency Transaction Report ("CTR"). Federal law makes it illegal for any person to "for the purposes evading the reporting requirements . . . structure or assist in structuring, or attempt to assist in structuring, any transaction with one or more domestic financial institutions." 31 U.S.C. § 5324(a)(3). The Treasury regulations describe what constitutes "structuring":

> [A] person structures a transaction if that person . . . conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under section 103.22 of this part. "In any manner" includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000,

or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.

31 C.F.R. § 103.11(gg). In order to sustain a conviction under 31 U.S.C. § 5324, we have held that the government must prove "only that a defendant had knowledge of the reporting requirements and acted to avoid them." *United States v. Cassano*, 372 F.3d 868, 878 (7th Cir. 2004) (quoting *United States v. Jackson*, 983 F.2d 757, 767 (7th Cir. 1993)), vacated on other grounds, 543 U.S. 1109, 125 S.Ct. 1018, 160 L.Ed.2d 1037 (2005) (citing *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)).

Van Allen was not charged with every currency transaction he made between 2002 and 2004. Each of Counts Five through Twenty-Nine detailed a group of cash deposits totaling over $10,000 with no single deposit exceeding $10,000, all occurring on a single day. For example, in Count Twenty-Four, Van Allen was charged with making four separate cash deposits totaling $25,795, each under $10,000, at three separate bank branches. The government used the other transactions as circumstantial evidence supporting the overall theory that Van Allen engaged in illegal structuring.

The record contains sufficient direct and circumstantial evidence to support the jury's finding that Van Allen structured his business transactions with the intent of evading the reporting requirements. The evidence showed that Van Allen withdrew and deposited massive

sums of money, all under $10,000, all allegedly in further-
ance of his auto parts business, and all without reporting
any business income on his tax return or bankruptcy
petition. The sheer volume of the transactions almost
compels the conclusion reached by the jury. *See Cassano*,
372 F.3d at 879 ("[I]t is unlikely, to the point of absurdity,
that it was pure coincidence that all [of the fifty-one]
checks cashed by [the defendant] were in denomina-
tions under $10,000."). The jury rejected Van Allen's
argument that the nature of the auto parts business
required him to engage in the pattern of withdrawals
and deposits of sub-$10,000 amounts. The jury most likely
did so by considering the irrational and inefficient nature
of the transactions; Van Allen paid almost $100,000 in
check-cashing fees at one of the currency exchanges. The
fact that Van Allen was willing to sacrifice efficiency and
convenience and paying the exorbitant transaction fees by
going to separate banks in the same day to make almost
identical deposits supports the inference that he knew
of and intended to avoid the reporting requirements. *See
United States v. MacPherson*, 424 F.3d 183, 191-92 (2d Cir.
2005). Taken as a whole, the evidence supports Van Allen's
conviction, and certainly does not add up to "a mani-
fest miscarriage of justice."

Van Allen further argues that the government failed
to meet its burden because the evidence does not amount
to the definition of "structuring." Primarily relying on
*United States v. Davenport*, 929 F.2d 1169 (7th Cir. 1991),
Van Allen argues that the only method of proving struc-
turing is to demonstrate that a defendant held a unitary
cash hoard over $10,000 and then broke it up to deposit in
amounts under $10,000. Because the government never
proved that Van Allen specifically split up a $10,000-plus

cash hoard into smaller amounts, Van Allen argues, his conviction was in error. Van Allen's misapplies our precedent. In *Davenport*, we upheld a conviction for structuring where the defendant made ten cash deposits, each under $10,000. We observed that the intent of the statute was to prevent individuals from evading the reporting requirement "by breaking their cash hoard into enough separate deposits to avoid activating the requirement." *Id.* at 1173. We did not hold, as Van Allen intimates, that this was the only method of proving structuring—indeed, we further defined "structuring" as "altering the form of a transaction in order to avoid activating the bank's duty to file a currency transaction report." *Id*. This definition meshes well with that in the Treasury regulation (31 C.F.R. § 103.11(gg)) and accurately describes Van Allen's activities in this case.

We acknowledge the issue raised by Van Allen concerning the implications of 31 U.S.C. § 5324(a)(3) for certain types of businesses. Small enterprises dealing primarily in cash and seeking to avoid an illegal structuring charge could theoretically be forced to maintain large amounts of cash on hand until meeting the $10,000 threshold. We would be more sympathetic to this argument had Van Allen cashed only a small handful of sub-$10,000 checks, or pointed to the unique nature of the auto parts business that, for whatever reason, necessitated transactions under $10,000. But Van Allen moved over $5 million over the course of a year and a half in amounts almost exclusively under $10,000, and proved nothing specific about his business that suggested a legitimate business purpose for those transactions. The fear raised, in this case at least, rings a bit hollow.

**B. Sufficiency of Evidence of Concealment of Business**

Van Allen next argues that his conviction on Count Three (concealment of business) should be overturned because the government failed to show that his "interest in his unincorporated business" was property belonging to the bankruptcy estate or that his "interest" was not otherwise disclosed in the bankruptcy schedules. As with the illegal structuring count, because this is an argument raised for the first time on appeal, we review for plain error and will reverse only if failing to do so results in "a manifest miscarriage of justice." *Beaver*, 515 F.3d at 741.

Count Three of the indictment charged Van Allen with violating 18 U.S.C. § 152(1) by "knowingly and fraudulently conceal[ing] from creditors and the United States Trustee property belonging to the defendant's bankruptcy estate, specifically, defendant's interest in an unincorporated automobile parts business." Section 152(1) makes it a crime to "knowingly and fraudulently conceal[ ] . . . in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor." The government presented ample evidence to convict Van Allen of this charge. In his bankruptcy petition, Van Allen was required to disclose the description, location, and current market value of his interest in any "unincorporated business"; to this query, Van Allen responded, "none." Van Allen was further required to disclose regular income and expenses from the operation of a business; again, Van Allen listed nothing. In the petition's Statement of Financial Affairs, Van Allen was required to list the gross amount of income from the operation of the debtor's business—defining "business" as including sole proprietorships—and Van Allen failed to make any such disclosures.

Van Allen argues that his automobile parts business was not "property," as the business was a "sole proprietor-ship" that did not have an independent legal status requiring disclosure. He contends that because federal courts look to state law to determine what kind of "prop-erty" an estate possesses, and that because under Illinois law "a sole proprietorship has no legal identity sepa-rate from that of the individual who owns it," he did not technically conceal any property. The logical result of Van Allen's argument would be that a sole proprietor-ship need not disclose *any* property related to the business in a bankruptcy proceeding, simply because of the legal status of the entity. But this cannot be the case, given the broad scope of the bankruptcy code's definition of "prop-erty of the estate." 11 U.S.C. § 541(a)(1) and (a)(6) (stating that "property" includes "all legal and equitable inter-ests of the debtor in property" and "[p]roceeds, product, offspring, rents, or profits of or from property of the estate"); *In re Yonikus*, 974 F.2d 901, 904-05 (7th Cir. 1992) ("The legislative history of § 541(a) in both the House and Senate provides, "The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property. . . ."). As a general rule, "[d]ebtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate." *Yonikus*, 974 F.2d at 904. Even if Van Allen believed his interest in his auto parts business was unavailable to the bankruptcy estate because a sole proprietorship did not constitute "property" under Illinois or federal law, con-sidering the broad scope of the definition, he never-theless had a duty to report it.

In any case, we need not delve too deeply into whether or not the sole proprietorship constituted a separate corporate form for the purposes of this statute, as the

evidence overwhelmingly showed that Van Allen did everything he could in the course of filing bankruptcy to conceal the fact that he was an auto parts businessman. Nowhere in the bankruptcy petition did Van Allen come close to mentioning that he was depositing and withdrawing hundreds of thousands of dollars through the Archer account in connection with his business. Even the balance that he reported in the bankruptcy petition for the Archer account—$100—was understated by thousands of dollars. Moreover, as the government noted, Van Allen had previously claimed that Treyzack Trailers was worth $150,000 on a mortgage loan application. The fact that Van Allen valued his business when seeking a loan but chose not to value his business when it was in his best interest not to do so further points to Van Allen's efforts to conceal his operation.

Van Allen also argues that his conviction should be vacated because any interest in his business was fully disclosed in other portions of the bankruptcy schedules. We disagree, and reject Van Allen's contention that debtors are allowed to "net out" any value he had in his business. Van Allen was required to disclose the regular income and expenses from the operation of his business. In choosing not to do so, or in choosing to conceal that income by incorporating it by reference in his other listed assets, Van Allen violated the law. We find nothing in the record that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." The record amply supports Van Allen conviction.

## C. Advice-of-Counsel Jury Instruction

The first three counts of the indictment charged Van Allen with concealment of assets in a bankruptcy. Van

Allen sought an advice-of-counsel instruction, arguing that
he made full disclosures to his bankruptcy attorney,
Piesiecki, and that her failure to list the bank accounts
and the auto parts business constituted legal advice upon
which he relied. The district court declined to give the
instruction, citing the lack of evidence that Piesiecki
actually instructed Van Allen not to list the assets and
the business.

We review a district court's "decision not to instruct
on a theory of defense *de novo.*" *United States v. Millet*,
510 F.3d 668, 675 (7th Cir. 2007). A defendant in a crim-
inal case is entitled to have the jury consider any theory
of defense that is supported by the law and that has
some foundation in the evidence, however tenuous. *United
States v. Al-Shahin*, 474 F.3d 941, 947 (7th Cir. 2007) (quot-
ing *United States v. Briscoe*, 896 F.2d 1476, 1512 (7th Cir.
1990)). An instruction on a defendant's theory of defense
may only be given to the jury if: (1) the instruction pro-
vides a correct statement of the law; (2) the theory
of defense is supported by the evidence; (3) the theory of
the defense is not part of the government's charge; and
(4) the failure to include the instruction would deprive
the defendant of a fair trial. *Millet*, 510 F.3d at 675 (quoting
*Al-Shahin*, 474 F.3d at 947).

"Advice of counsel is not a free-standing defense, though
a lawyer's fully informed opinion that certain conduct
is lawful (followed by conduct strictly in compliance
with that opinion) can negate the mental state required
for some crimes, including fraud." *United States v. Roti*,
484 F.3d 934, 935 (7th Cir. 2007). In order for this theory
to be supported by the evidence, a defendant must estab-
lish the following elements:

(1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct, (4) and made a full and accurate report to his attorney of all material facts which the defendant knew, (5) and acted strictly in accordance with the advice of his attorney who had been given a full report.

*Al-Shahin*, 474 F.3d at 947-48.

At trial, Van Allen produced evidence suggesting that Piesiecki knew of (or should have known of) his business and the bank accounts at issue. Mrs. Van Allen testified that at the August 9, 2003 meeting, Van Allen told Piesiecki that he was operating his auto parts business, though it was not profitable enough to stave off the creditors. She further testified that Van Allen gave Piesiecki documents referencing all of their bank accounts, including those ultimately omitted from Van Allen's bankruptcy petition. Piesiecki contradicted this testimony. She testified that Van Allen told her that he had ceased operating his auto parts business after September 11, 2001, and that his only current source of income was from the Village of Justice. Piesiecki also testified that the Van Allens represented that of the two disputed accounts, one account was in Mrs. Van Allen's name only, and the other account was in the name of Mrs. Van Allen and her daughter.

In either version of the facts, a key piece of evidence is missing. Van Allen did not show that Piesiecki advised him to omit assets or his business from the bankruptcy petition. More to the point, Piesiecki specifically testified that she never advised Van Allen to do so. Van Allen could not have "acted strictly in accordance with the

advice of his attorney" because Van Allen did not produce evidence suggesting that his attorney advised him to act in any particular way. The district court correctly concluded that the core of the advice-of-counsel instruction—advice of counsel—was lacking, and that therefore the evidence did not support Van Allen's theory of the case. Without evidence supporting Van Allen's theory on advice of counsel, no instruction was warranted.

### D. Concealment of Home Jury Instruction

Van Allen argues that his conviction on Count One (concealment of his interest in his home) should be overturned because it was based on an inadequate theory of concealment. At trial, the government introduced evidence that Van Allen concealed his home by, among other things, failing to disclose his interest in a trust that held title to the house. The government also introduced, through a representative of the Bridgeview Bank & Trust company, evidence regarding the trust itself, including an incident that occurred after Van Allen was indicted. In January or February of 2006, Van Allen apparently contacted a Bridgeview official and attempted to correct a "mistake" in the trust—namely, that the trust should have been set up in the name of his wife, and not him. The government used this evidence as further support of the concealment charge.

The district court instructed the jury regarding the elements of the crime of concealment. The court defined "concealment" as "means to withhold information required by law to be made known." The court elaborated on the meaning: "[s]ince the offense of concealment is a continuing one, the acts of concealing may have begun

before as well as after the bankruptcy offense." This definition followed that outlined in the Seventh Circuit Pattern Criminal Federal Jury Instructions for 18 U.S.C. § 152 (defining "concealment").

Van Allen contends that the government argued, and the instructions reflect, two separate theories of concealment, the second of which was legally dubious. He asserts that the jury was lead to believe that they could have convicted Van Allen by either (1) his failure to list his home in his bankruptcy schedules; or (2) his attempt to correct the mistake with Bridgeview Bank & Trust. The attempt in this second theory, he argues, cannot serve as an independent basis for a conviction on Count One. He points to *Griffin v. United States*, 502 U.S. 46, 59-60, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) and *Tenner v. Gilmore*, 184 F.3d 608, 611 (7th Cir. 1999), for the proposition that a verdict must be set aside if it is impossible to tell which of two grounds—one sound, one flawed—a jury selected. *See Griffin*, 502 U.S. at 52, 112 S.Ct. at 470 (quoting *Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)).

Van Allen misapplies these cases. Assuming *arguendo* that Van Allen could not be convicted on the basis of the conversation with the Bridgeview official alone, Van Allen does not establish that this theory ever reached the jury. The district court never instructed the jury that it could rely on the Bridgeview Bank incident as an independent basis for the conviction, nor did the government argue that theory to the jury. Rather, the jury was properly instructed that the offense of concealment was a continuing offense, meaning that it could consider actions taken by

Van Allen after he filed for bankruptcy (including the Bridgeview Bank incident) as further support of the concealment count. Because the jury was instructed on one legal theory—and not one adequate and another inadequate theory—we affirm Van Allen's conviction on Count One.

### E.   Relevance of Filing CTRs

Finally, Van Allen argues that the district court erroneously excluded on relevance grounds the fact that Archer Bank actually filed CTRs. He argues that the structuring counts—Counts Five through Thirty-Two—should be reversed accordingly. On several occasions, the Archer Bank filed CTRs on a day in which Van Allen made several deposits totaling $10,000, even though no single deposit exceeded $10,000. Prior to trial, the government moved *in limine* to exclude evidence that Archer Bank filed the reports as a result of Van Allen's cash deposits. The government argued that the filing of CTRs would have no relevance with regard to Van Allen's guilt or innocence of the structuring charges. The district court agreed, and held that whether or not the bank actually filed the CTRs had no bearing on Van Allen's knowledge and intent.

Van Allen argues that the CTRs were relevant to the jury's consideration of both his knowledge of the bank reporting requirements and his intent to avoid those requirements. We review evidentiary rulings for an abuse of discretion. *United States v. Savage*, 505 F.3d 754, 760 (7th Cir. 2007). "Because we give great deference to the trial judge's evidentiary rulings, we will not reverse unless the record contains no evidence upon which the trial judge

rationally could have based his decision." *Id.* (citing *United States v. Gajo*, 290 F.3d 922, 926 (7th Cir. 2002)). Evidence is relevant and therefore admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 and 402.

We fail to see the logical connection between the fact of Archer Bank's filing of CTRs and Van Allen's guilt or innocence. The actions of Archer Bank following Van Allen's various deposits and withdrawals do not demonstrate anything material about Van Allen's state of mind. At most, the filing of CTRs may have indicated something about the knowledge of officials at Archer Bank; but such knowledge would not make it more or less likely that Van Allen knew of the reporting requirements or acted to avoid them. Whether or not Van Allen actually fooled Archer Bank has no bearing on the substantive violation under 31 U.S.C. § 5324(a). *See Cassano*, 372 F.3d at 878 (holding that the government must show "only that a defendant had knowledge of the reporting requirements and acted to avoid them"). The multiple cases cited by Van Allen for the proposition that a jury may consider the consequences of a defendant's actions as circumstantial evidence of the defendant's intent—*see, e.g.*, *United States v. Sloan*, 492 F.3d 884, 891 (7th Cir. 2007); *United States v. Stephens*, 421 F.3d 503, 509 (7th Cir. 2005)—only suggest that a court *may* allow such evidence before the jury, and not that the exclusion of such evidence is an abuse of discretion.

The government presented ample evidence that Van Allen acted to avoid the reporting requirements. Regarding his intent to do so, the government offered

adequate circumstantial evidence, primarily in the form of the inefficiency of Van Allen's business practices and the statements made to an FBI agent regarding the "aggravation" of filing extra paperwork. Accordingly, we do not find that excluding the CTRs was inconsistent with substantial justice.

### III.  Conclusion

For the foregoing reasons, we AFFIRM Van Allen's conviction and sentence.