In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3490

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARK J. MCGILL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 CR 770 — **Joan B. Gottschall**, *Judge.*

ARGUED MAY 21, 2013 — DECIDED JUNE 13, 2014

Before POSNER, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* By the government's account,
Mark McGill spent most of his free time in his apartment and
rarely socialized except with Jacob "Jake" Elliott. Elliott had
befriended McGill in 2006 after they met through an acquain-
tance who shared their sexual attraction to young boys. It was
Elliott who introduced McGill to child pornography, yet
during their three-year friendship, he had never known McGill

to give child pornography to anyone, not even when Elliott took him to a 2008 gathering arranged specifically for participants to swap child pornography. Elliott, on the other hand, regularly attended these events and was using the Internet to distribute child pornography, including photos he took of himself sexually assaulting a young boy.

Elliott was arrested in 2009 and, when offered hope of leniency, became an FBI informant. He targeted McGill, who, after weeks of pestering, allowed Elliot to bring a USB flash drive to his apartment to copy child pornography from his computer. For this indulgence McGill was charged with *distributing* child pornography in addition to possession. *See* 18 U.S.C. § 2252A(a)(2), (a)(5)(B). At trial he sought to raise entrapment as a defense to the distribution count, but prosecutors convinced the judge not to instruct the jury on that defense. McGill was found guilty of both crimes, and on appeal he argues that refusing to give an entrapment instruction was reversible error. We agree with him.

## I.

The question before us is whether a rational jury could have found in favor of McGill on the issue of entrapment. In answering that inquiry, we look at the trial evidence in the light most favorable to McGill. *See United States v. Pillado*, 656 F.3d 754, 758 (7th Cir. 2011); *United States v. Díaz-Maldanado*, 727 F.3d 130, 136 (1st Cir. 2013); *United States v. Theagene*, 565 F.3d 911, 917–18 (5th Cir. 2009); *United States v. Glover*, 153 F.3d 749, 752 (D.C. Cir. 1998).

The FBI had executed a search warrant at Elliott's residence in June 2009 and found thousands of images of child pornogra-

phy. Those images include Elliott's photos of himself abusing a young boy. When Elliott was told (quite accurately) that life imprisonment was a genuine possibility, he agreed to help investigators gather evidence against fellow members of "boylovers," a group interested in child pornography featuring young boys.

Elliott's cooperation, which mostly involved meeting or telephoning suspects, led to the arrests of several men, including McGill, then 24 years old. Before trial McGill notified prosecutors that he intended to raise an entrapment defense, though only on the distribution count. The government responded by moving *in limine* to prevent McGill from arguing entrapment or eliciting evidence supporting that affirmative defense. The district court denied the government's motion but reserved for trial a decision whether to instruct the jury on entrapment.

At trial Elliott was the government's star witness. He testified that he and McGill belonged to "boylovers," whose members mostly interacted online but occasionally met in person. Elliott conceded, however, that he hadn't mentioned McGill when the FBI first asked him to name others in the group. For some time the two had been socializing in person at least twice monthly, yet McGill's name as a possible target did not surface until, by chance, he telephoned Elliott during a June 2009 meeting with agents.

After that the investigation of McGill began in earnest. Over the next three weeks, Elliott repeatedly telephoned him probing his activities and asking for child pornography. In the first of these fifteen recorded calls, McGill disclaimed any

interest in acquiring more child pornography and said he felt uncomfortable even discussing the subject of child pornography with anyone but Elliott. McGill proposed that they simply "hang out," but Elliott steered the conversation back to child pornography. He said that fear of being caught had led him to discard his stash, which now he wanted to replace. Another "boylover," Elliott prompted, already had promised to provide copies of his files. McGill said he possibly could help, though he quickly added that the other member's collection likely was much larger. As this conversation wound down, McGill repeated that Elliott was the only person he trusted to converse with about child pornography.

McGill's unease around other people, even other "boylovers," is evident throughout the recordings. On one occasion Elliott left a message proposing that the group meet; McGill did not respond, and when Elliott called again pushing for a gathering, McGill balked. In particular he opposed Elliott's plan to bring along someone new. McGill voiced reluctance to mingle with unfamiliar faces, and although he finally he agreed to tag along, he later canceled and went camping.

Elliott reacted by calling and pressuring McGill to attend a "boylovers" meeting. The group should assemble—ideally, he suggested, at McGill's apartment. McGill rebuffed the idea, saying he was uncomfortable hosting anyone but Elliott. McGill suggested that just the two of them meet somewhere for a beer or to play frisbee golf. Elliott countered that he first wanted to stop by McGill's apartment with a flash drive and copy the child pornography on his computer. McGill relented.

Yet when that day arrived, McGill called to cancel, saying he was sick. Elliott, perhaps thinking he was lying, pushed to stop by anyway. McGill refused. At Elliott's prodding, though, he agreed to call later in the day if he felt better. When McGill did not call, Elliott did. McGill acquiesced to the visit, and Elliott brought along a flash drive that they used to copy McGill's collection of child pornography.

In the days after, Elliott continued calling McGill urging him to attend a party (actually, an FBI sting) with others interested in child pornography. McGill rejected the invitation. During one telephone conversation, he elaborated on his social anxiety and said that being with more than a couple of people makes him uncomfortable. Even Elliott's visit, he added, had caused him to experience a near panic attack. This information did not surprise Elliott; at trial he conceded knowing that McGill was a "loner" who regularly conversed with him but no one else outside of family.

Elliott's work to ensnare McGill yielded hours of recorded conversations devoted mostly to subjects other than child pornography. As Elliott conceded at trial, the two discussed topics ranging from music and politics to the supernatural and roommate troubles. He also admitted that McGill wasn't the one who turned their conversations to child pornography. Elliott's objective, he conceded, was persuading McGill to distribute child pornography.

The district court, after hearing this evidence, refused McGill's request to instruct the jury on his defense of entrapment to the distribution count. The court accepted McGill's argument that the government had not proved he was predis-

posed to distribute child pornography. On the other hand, the court reasoned, neither was there evidence that McGill was induced to give Elliott copies of the files on his computer. The court characterized the pressure exerted by Elliott as "pretty nil" and "nothing out of the ordinary." McGill had been "willing to do this for Mr. Elliott," the court added, though "not for anybody else." After the jury returned guilty verdicts, McGill moved for a new trial on the ground that withholding the entrapment instruction deprived him of a fair trial. That motion was denied.

McGill's act of sharing his files with Elliott increased the high end of his guidelines imprisonment range by more than 6 years, and his conviction for distribution subjected him to a 5-year statutory minimum. *See* 18 U.S.C. § 2252A(b)(1). Under U.S.S.G. § 2G2.2, which applies to convictions for both possession and distribution, McGill would have received upward adjustments of 2 levels because children depicted were younger than 12, *id*. § 2G2.2(b)(2); 4 levels because some images depict violence, *id*. § 2G2.2(b)(4); 2 levels because a computer was used, *id*. § 2G2.2(b)(6); and 5 levels because of the large number of images, *id*. § 2G2.2(b)(7)(D). The base offense level for distribution, however, is 22 rather than 18. *Id*. § 2G2.2(a). McGill had no criminal history, so sharing his child pornography with Elliott increased his guidelines exposure from a range of 108 to 135 months (Total Offense Level 31 × Criminal History Category I) to a range of 168 to 210 months (Total Offense Level 35[1] × Criminal History

---

[1]    Whenever a child-pornography prosecution involves

(continued...)

Category I). Had McGill pleaded guilty just to possession, as it seems he was willing to do, his imprisonment range likely would have dropped to 78 to 97 months (Total Offense Level 28 × Criminal History Category I).

The prosecutor insisted that it was McGill's idea to share his child pornography with Elliott, not Elliott's idea. Thus, the prosecutor argued, a prison sentence within the guidelines range would be appropriate. McGill's lawyer countered that the statutory minimum would be adequate punishment.

---

[1] (...continued)

distribution, there is, by default, a further increase of at least 2 levels. U.S.S.G. § 2G2.2(b)(3)(F). That upward adjustment would have bumped McGill's total offense level to 37 and his imprisonment range to 168 to 210 months, nearly twice the range for possession. The district court did not apply this 2-level increase, however, because the government, citing our decision in *United States v. Tenuto*, 593 F.3d 695, 697 (7th Cir. 2010), asserted that impermissible "double counting" would result from giving this increase in a prosecution for distribution. We take no position concerning the government's reading of *Tenuto*. We note, however, that five circuits have rejected double-counting objections to the application § 2G2.2(b)(3)(F) in prosecutions for distribution of child pornography. *See United States v. Clark*, 2014 WL 289460, at *1 (6th Cir. Jan. 28, 2014); *United States v. Reingold*, 731 F.3d 204, 227–28 (2d Cir. 2013); *United States v. Chiaradio*, 684 F.3d 265, 282–83 (1st Cir. 2012); *United States v. Frakes*, 402 F. App'x, 332, 335–36 (10th Cir. 2010); *United States v. Fugit*, 296 F. App'x 311, 312–13 (4th Cir. 2008).

Defense counsel spoke only briefly and suggested that the district court would benefit more from hearing directly from McGill, who before sentencing had submitted to a psychosexual evaluation. The psychologist concluded, in part, that from a young age McGill had become fixated on sexual activity initiated by another boy who was a couple of years older than he was. The psychologist had found McGill to be remorseful and believed his explanation that he distributed child pornography only because he did not want to turn down Elliott, his friend and the person who introduced him to child pornography.

During his allocution McGill recalled the beginning of his involvement with the "boylovers" group when he was 17 years old, explaining that his "intention from the start was to find somebody … that I could talk to about my problems that wouldn't treat me like I was a monster." He was "so terrified to seek help from those who might actually provide it," said McGill, that he dug himself "much deeper into the problem that I sought to fix." McGill acknowledged being selfish and immature, and indifferent "to the lives of the children who were devastated to create the images he possessed." He expressed deep remorse for the "pain and anguish" experienced by his victims and their families.

The district judge, who earlier in the sentencing proceeding had said that McGill never would have distributed child pornography "if the Government hadn't set him up to do it," sentenced McGill to 108 months. In explaining that below-range term, the judge emphasized her disagreement with the 2-level upward adjustment for use of a computer, *see* U.S.S.G. § 2G2.2(b)(6), and, impressed by the sincerity of McGill's

remorse, suggested that he should receive significant credit for acceptance of responsibility whether or not § 3E1.1 technically applied. "I'm not sure," the judge remarked, "that anybody has ever come to terms with what he did in the way Mr. McGill has." The judge decided that McGill deserved a break equivalent to 4 offense levels, which effectively reduced his total offense level to 31 (from 35) and placed him in the same imprisonment range of 108 to 135 months that he would have faced with only a conviction for possession. Had the judge given McGill that same break without his conviction for distribution, his imprisonment range effectively would have been 70 to 87 months.

## II.

On appeal McGill challenges the district court's rejection of his jury instruction on entrapment. Entrapment occurs when the government coerces a defendant into committing an illegal act he was not otherwise predisposed to commit. *See United States v. Russell*, 411 U.S. 423, 434–35 (1973); *Sherman v. United States*, 356 U.S. 369, 372 (1958); *Pillado*, 656 F.3d at 763. The defense of entrapment recognizes that a goal of law enforcement is to prevent crime, not to tempt citizens to engage in criminal activity. *See Sherman*, 356 U.S. at 372; *United States v. Hollingsworth*, 27 F.3d 1196, 1200 (7th Cir. 1994) (en banc).

An entrapment instruction is warranted if the evidence would permit a jury to find that the defendant was not predisposed to commit the crime and that the government induced him to do so. *See Pillado*, 656 F.3d at 763; *United States v. Santiago-Godinez*, 12 F.3d 722, 728 (7th Cir. 1993). Although

more than a scintilla of evidence of entrapment is needed
before instruction on the defense becomes necessary, the
defendant need only point to evidence in the record that would
allow a rational jury to conclude that he was entrapped.
*See United States v. Haddad*, 462 F.3d 783, 789–90 (7th Cir. 2006);
*United States v. Blassingame*, 197 F.3d 271, 280 (7th Cir. 1999).
Whether a defendant was entrapped typically is a question for
the jury. *See Mathews v. United States*, 485 U.S. 58, 63 (1988);
*United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012).

The district court identified nothing in the record suggest-
ing that McGill was predisposed to distribute child pornogra-
phy, and on this point we agree. In the first place, the govern-
ment's investigation turned up no evidence that McGill ever
before had distributed child pornography. The government
concedes as much, but asserts that McGill never shied away
from situations in which child pornography was distributed,
and that his very possession of child pornography is evidence
of a predisposition to distribute. We are not persuaded.

Concerning the government's first point, McGill's behavior
in situations when others around him were sharing child
pornography belies an inference that he himself was predis-
posed to distribute. The government points to McGill's use of
file-sharing applications to *acquire* child pornography, but so
what? These applications, although designed to promote
sharing, also permit a user to exclude outsiders from gaining
access to files on the user's computer.[2] The government offered

---

[2]     For a useful discussion of the how these applications permit

                                            (continued...)

no evidence that McGill had unlocked his files even while he had file-sharing applications on his computer. Moreover, in Elliott's very first recorded phone call to McGill, the defendant was explicit that he would not again use file-sharing applications. The government also makes much of McGill's attendance at a party where other men were distributing child pornography. But McGill *took nothing* to that party (and brought nothing home), and the next time Elliott pushed him to attend a similar gathering, McGill declined.

The government's other premise, that McGill's possession of child pornography is evidence of a predisposition to distribute, proves too much. Possession and distribution are very different crimes; the government's long history of prosecuting drug offenses surely makes this evident, as possession of a controlled substance generally is a misdemeanor but distribution, even of small amounts, is a felony. *See* 21 U.S.C. §§ 841(a)(1), 844(a); *Abuelhawa v. United States*, 556 U.S. 816, 822 (2009) (describing history of statutory designation of drug crimes as misdemeanors or felonies); *United States v. Swiderski*, 548 F.2d 445, 450–51 (2d Cir. 1977) (joint purchase of cocaine punishable only as misdemeanor possession, not felony distribution). The government is not free to induce

---

[2] (...continued)

users to restrict the files they share, see *United States v. Handy*, 2009 WL 151103, at *2 (M.D. Fla. Jan. 21, 2009). *See also* Note, Maggie Muething, *Inactive Distribution: How the Federal Sentencing Guidelines for Distribution of Child Pornography Fail to Effectively Account for Peer-to-Peer Networks*, 73 Ohio St. L.J. 1485, 1489 & nn.23–26 (2012).

more-serious crimes simply because the target already committed a lesser crime. *See Sherman*, 356 U.S. at 376 (explaining that entrapment occurs when government "beguiles" defendant into engaging in crimes that "he otherwise would not have attempted"); *see also United States v. Swiderski*, 539 F.2d 854, 857–59 (2d Cir. 1976) (drug users entitled to entrapment instruction on distribution charge); *United States v. Watson*, 489 F.2d 504, 507–09 (3d Cir. 1973) (drug user entitled to entrapment instruction on distribution charge); *United States v. Cardi*, 478 F.2d 1362, 1367 (7th Cir. 1973) (jury properly instructed on entrapment in prosecution of drug user for distribution).

The government rejoins that sending Elliott after McGill ensnared only an unwary *criminal*, and at oral argument made much of the statement in *Sherman*, 356 U.S. at 372, that "a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *See also Russell*, 411 U.S. at 436. But the ranks of the "unwary innocent" are not limited to those whose lives are crime free. *See, e.g.*, *Sherman*, 356 U.S. at 376; *United States v. Luisi*, 482 F.3d 43, 58 (1st Cir. 2007) (member of La Casa Nostra who previously engaged in drug trafficking was entitled to entrapment instruction on cocaine-trafficking charges); *United States v. Ewbank*, 483 F.2d 1149, 1151 (9th Cir. 1973) ("The fact that appellant here was involved in the drug culture, according to his own admission being a user, does not establish that he was also a predisposed seller or distributor within the meaning of the crime of which he was convicted."); *accord United States v. Isnadin*, 742 F.3d 1278, 1297, 1301–02 & n.31 (11th Cir. 2014) (approving jury instructions permitting jury to find entrapment to some, but not all, charged crimes); *United States v. Mitchell*, 67 F.3d 1248, 1252–57

(6th Cir. 1995) (same). McGill was not innocent of possession—and never claimed to be—but before his August 2009 meeting with Elliott he was, as far as the government can say, innocent of the crime of distributing child pornography.

Despite finding no evidence of predisposition, the district court refused to instruct the jury on entrapment because the court did not think that McGill had pointed to evidence of government inducement. Here we part ways with the district judge. Government exploitation of friendship can constitute improper inducement. *See, e.g., Sherman*, 356 U.S. at 371–73 (majority op.); *id.* at 383 (Frankfurter, J., concurring); *Sorrells v. United States*, 287 U.S. 435, 439–40 (1932); *United States v. Poehlman*, 217 F.3d 692, 702 (9th Cir. 2000); *United States v. Gamache*, 156 F.3d 1, 11 (1st Cir. 1998); *United States v. Nations*, 764 F.2d 1073, 1080 (5th Cir. 1985); *United States v. McLernon*, 746 F.2d 1098, 1113–14 (6th Cir. 1984). Assessing an entrapment defense involves a subjective inquiry, *see Pillado*, 656 F.3d at 764–66; *United States v. Stallworth*, 656 F.3d 721, 726 (7th Cir. 2011), meaning that a defendant is entitled to argue that he was particularly susceptible to inducement, *see, e.g., United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006); *United States v. Nunn*, 940 F.2d 1148, 1149 (8th Cir. 1991); *United States v. Newman*, 849 F.2d 156, 165 (5th Cir. 1988); *accord McLernon*, 746 F.2d at 1115.

Elliott himself characterized McGill as a loner with few other friends, living in near isolation. And the jury had before it McGill's confession to Elliott of his social anxiety. Elliott alone could have traded on McGill's insecurities to make the number of telephone calls that he did in a brief period of time.

The jury heard many of those conversations, and Elliott conceded that whenever McGill innocently turned the discussion to one of many subjects unrelated to child pornography, as he often did, Elliott would do his best to steer McGill back to the single objective of the FBI's investigation: convincing him to download child pornography for Elliott, his friend.

We conclude that this record provided a sufficient basis for a rational jury to infer that Elliott exploited his unique connection with McGill to induce the defendant to distribute child pornography. At trial and now on appeal the government has been emphatic that McGill, not Elliott, instigated the distribution crime during their very first recorded telephone conversation. McGill offered to share his files with Elliott, the government insists, without being directly asked. But this gloss on the telephone conversation is not the only one that is reasonable. By the time McGill "offered" his files to Elliott, he already knew that Elliott had arranged to obtain a third party's collection. And that collection, McGill was quick to add, was far superior to his own. As we see it, that sequence, along with McGill's observation about the third party's collection of child pornography, would allow a rational jury to conclude that McGill's overture was intended to protect a friendship with one of the few people with whom he was comfortable. The real test came when Elliott—so it seems—surprised McGill by accepting his gesture of friendship, and after that at every turn McGill stalled on delivering the goods. A rational, properly instructed jury could have seen things differently than the government and concluded that McGill's vulnerability and fear of losing Elliott's friendship left him particularly susceptible to government inducement. Indeed, the district judge seems to

have found this inference compelling, as she made known her belief that the government had exploited McGill's friendship with Elliott.

The existence of competing inferences is precisely why the issue of entrapment should have been submitted to the jury. The question is not whether the government's take strikes us as logical or even probable, but simply whether "there exists evidence sufficient for a reasonable jury to find" in the defendant's favor. *Mathews*, 458 U.S. at 63; *see Pillado*, 656 F.3d at 766–68. An evidentiary foundation for a defensive theory, "however tenuous" that foundation might seem, compels submitting the defense to the jury. *See United States v. Kokenis*, 662 F.3d 919, 929 (7th Cir. 2011) (internal quotation marks and citation omitted); *see also United States v. Sawyer*, 558 F.3d 705, 710 (7th Cir. 2009); *United States v. VanAllen*, 524 F.3d 814, 823 (7th Cir. 2008). The evidence before the jury in this case easily clears that minimal hurdle.

McGill's conviction on the distribution count is REVERSED, and that count is REMANDED for further proceedings. On remand the government must proceed without delay if it elects to retry McGill on that count. McGill's sentence on the possession count is VACATED; that concurrent sentence is linked to his conviction for distribution and, on remand, must be reconsidered in conjunction with the disposition of the distribution charge.