**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-4126

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JASON JOYNER,

Defendant - Appellant.

No. 23-4139

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ONYEWUCHI IBEH,

Defendant - Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:21-cr-00200-CMH-2; 1:21-cr-00200-CMH-1)

Submitted:  October 7, 2024                         Decided:  December 30, 2024

Before THACKER and BENJAMIN, Circuit Judges, and KEENAN, Senior Circuit Judge.

————————————

Affirmed by unpublished per curiam opinion.

————————————

**ON BRIEF:** Crystal A. Meleen, KEATS & MELEEN PLC, Fairfax, Virginia, for Appellant Jason Joyner. Andrew M. Stewart, DENNIS, STEWART & KRISCHER, PLLC, Arlington, Virginia, for Appellant Onyewuchi Ibeh. Jessica D. Aber, United States Attorney, Richmond, Virginia, Christopher J. Hood, Assistant United States Attorney, Russell L. Carlberg, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

————————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jason Joyner and Onyewuchi Ibeh appeal from their various money laundering convictions, and Ibeh appeals from his 120-month sentence. On appeal, they challenge the sufficiency of the evidence supporting their convictions, the jury instructions, and Ibeh's leadership sentencing enhancement. Finding no reversible error, we affirm.

## I.

The laundered money in this case was related to a business email compromise ("BEC") scheme. In such a scheme, fraudsters first infiltrate a business's email system. Then, the fraudsters use a spoofed email account to pretend to be the business and to convince a customer to send money to an account controlled by the fraudsters instead of the account usually used by the business. By redirecting the payment, the fraudsters steal the business's money without the business immediately discovering the fraud. The funds in the account are then quickly depleted, being sent through direct payment to a handful of individuals at other financial institutions, where they are further distributed. Ibeh and Joyner did not participate in the underlying fraud. However, for years, Ibeh—with the help of Joyner and others—ran a network of accounts that laundered the proceeds of a BEC scheme.

## II.

Appellants challenge the sufficiency of the evidence supporting their convictions. We view the evidence in the light most favorable to the Government to determine whether the guilty verdict is supported by substantial evidence. *United States v. Bailey*, 819 F.3d 92, 95 (4th Cir. 2016). Substantial evidence is "evidence that a reasonable finder of fact

could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted). "In determining whether there is substantial evidence to support a verdict, we defer to the jury's determinations of credibility and resolutions of conflicts in the evidence, as they are within the sole province of the jury and are not susceptible to judicial review." *United States v. Louthian*, 756 F.3d 295, 303 (4th Cir. 2014) (internal quotation marks omitted). "[I]f the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." *United States v. McLean*, 715 F.3d 129, 137 (4th Cir. 2013) (internal quotation marks omitted).

Both Appellants first challenge their conspiracy to commit money laundering convictions. In order to prove conspiracy to commit money laundering, the Government needed to prove "(1) an agreement to commit money laundering existed between one or more persons; (2) the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy." *United States v. Singh*, 518 F.3d 236, 248-49 (2008). While they concede that a conspiracy existed, Ibeh and Joyner argue that there was insufficient evidence that they had knowledge that the funds deposited in their accounts were derived from illegal activities or that they knowingly and voluntarily became part of the conspiracy.

Joyner and Ibeh contend that their behavior was consistent with that of innocent parties. Joyner used his own name, birthdate, and social security number to open bank accounts, and he openly conducted transactions both inside the bank and at ATMs with no attempt to disguise himself. Despite phone searches, no incriminating emails were found.

4

In addition, both Appellants spoke voluntarily with police, without attorneys present. Joyner repeatedly stated that he did not know what was going on, and Ibeh provided information but asserted that he did not have the details of the scheme.

However, in his police interview, Joyner agreed that some of his bank accounts were dirty, that they were involved in the money laundering conspiracy, and that they were part of the scheme. He stated that he was provided hundreds of dollars to conduct transactions involving thousands of dollars and that he provided his banking information to Ibeh and permitted Ibeh to freely use his bank accounts. While he asserts that he trusted Ibeh and did not know why Ibeh wanted to use his accounts, Joyner not only permitted his account to be used by Ibeh but, after it was closed for fraud, Joyner opened another account for the same purpose. In addition, Joyner made numerous large withdrawals of thousands of dollars, many within short periods of time of each other, that were below the amount that would have triggered the bank's reporting requirements. Joyner delivered the cash to Ibeh in exchange for payment. In addition, when dealing with subsequent accounts, Joyner lowered his withdrawal amounts. Finally, Joyner could have made fewer withdrawals in larger amounts, although that would have triggered reporting requirements.

Turning to Ibeh, at his request, coconspirators opened accounts at multiple financial institutions. Ibeh then accessed and operated the accounts, received large wire transfers from unrelated companies, and sent most of the money overseas. In all, Ibeh operated at least 17 bank accounts, all of which were closed for fraud. Despite having full access to Joyner's accounts, he requested that Joyner make cash withdrawals and pass the cash on to

5

him.  Ibeh made a substantial amount of money from these transactions that he did not declare on his tax returns.

Further, Ibeh's own words indicate his knowledge of illegality.  During his interview, Ibeh stated that the innocent explanations he was given did not make sense and that he determined that his actions were illegal.  He also was able to explain, in general terms, the hierarchy of the scheme, and he was aware that the people "overseas" were in charge of the scheme and making most of the money.  Given Appellants' actions and statements even after account closures, the jury could reasonably infer that they must have known that the money was acquired from some form of unlawful activity.  *See, e.g., United States v. Carr*, 25 F.3d 1194, 1205 (3rd Cir. 1994) (permitting inference from circumstantial evidence); *United States v. Long*, 977 F.2d 1264, 1269-70 (8th Cir. 1992) (same).

In addition, both Joyner and Ibeh knowingly joined the conspiracy.  Ibeh enlisted the help of others to move money through different accounts and to send money overseas. He requested and was given access to coconspirators' accounts, and he used that access to make numerous transactions.  Joyner knowingly agreed to receive money from Ibeh into his account, to withdraw that money in cash, and to give the cash to Ibeh.  Even if Ibeh and Joyner were not aware of the details of the underlying crimes, their admitted actions, combined with their knowledge that the funds were illegally obtained, showed that Ibeh and Joyner knowingly joined the conspiracy.  As such, there was sufficient evidence supporting the conspiracy convictions.

6

Next, Ibeh challenges his convictions for concealment money laundering under 18 U.S.C. § 1956(a)(1) and unlawful monetary transactions under 18 U.S.C. § 1957. In order to sustain a concealment money laundering conviction, the Government must prove: (1) the defendant conducted a financial transaction with the proceeds of specified unlawful activity; (2) the defendant knew that the proceeds were from "some form of unlawful activity"; and (3) the defendant knew that the transaction was designed to conceal or disguise "the nature, the location, the source, the ownership, or the control" of the proceeds. 18 U.S.C. § 1956(a)(1)(B)(i). The part of the statute requiring that the defendant knew the proceeds were from "some form of unlawful activity" requires proof that the defendant "knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony." 18 U.S.C. § 1956(c)(1); *see United States v. Campbell*, 977 F.2d 854, 858 (4th Cir. 1992) (holding that the "fraudulent nature of the transaction itself" provided a sufficient basis for a jury inference of knowledge).

Section 1957 prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 . . . derived from specified unlawful activity." 18 U.S.C. § 1957(a). "[C]riminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). Sections 1956 and 1957 "criminalize similar acts-monetary transactions in criminal proceeds-and simply do so from slightly different angles." *United States v. Kratt*, 579 F.3d 558, 560-61 (6th Cir. 2009). Unlike § 1956, which prohibits classic money laundering, § 1957 "does not require that the defendant

7

know of a design to conceal aspects of the transaction or that anyone have such a design." *United States v. Wynn*, 61 F.3d 921, 926–27 (D.C. Cir. 1995). Like § 1956, § 1957 does not require proof that the defendant knew the precise nature of the criminal offense from which the proceeds were derived; it requires only that the defendant knew the property involved was "derived from, directly or indirectly, proceeds obtained by some criminal offense." *United States v. Allen*, 129 F.3d 1159, 1164 (10th Cir. 1997).

Ibeh asserts that the evidence on the § 1956 and § 1957 counts was insufficient to show that he possessed the required knowledge. We find that the evidence was more than sufficient. First, as discussed above, there was sufficient evidence from which the jury could infer that Ibeh knew the money involved in these offenses came from illegal activity. Second, the speed with which Ibeh moved the funds through bank accounts opened in other people's names was sufficient to show that Ibeh intended to conceal the location and control of the funds in question. Third, the evidence easily showed that Ibeh repeatedly conducted monetary transactions involving over $10,000.

Finally, Joyner challenges the sufficiency of the evidence supporting his structuring convictions. To prove Joyner guilty of structuring in violation of 31 U.S.C. § 5324(a), the Government was required to prove that he knowingly engaged in structuring, that he knew of the financial institution's reporting requirements, and that the purpose of his transactions was to evade the reporting requirement. *See United States v. Beidler*, 110 F.3d 1064, 1066 (4th Cir. 1997); *United States v. $79,650.00*, 650 F.3d 381, 384 (4th Cir. 2011) (citing instructions of the trial judge without criticism). Joyner concedes that the evidence showed that he engaged in a pattern of transactions that routinely fell below the threshold for

8

reporting. However, he asserts that there was insufficient evidence that he knew of the reporting requirement and/or that the purpose of the transactions was to evade the reporting requirement.

The applicable totality of the circumstances approach permits a jury to "reasonably infer from the pattern of [the defendant's] structuring" that the defendant "knew of" the requirements and "intended to evade" them. *United States v. MacPherson*, 424 F.3d 183, 190–91 (2d Cir. 2005). Here, the evidence showed that Joyner repeatedly made cash withdrawals of just under $10,000 within a short period of time, when his bank balance often would have permitted withdrawal of larger sums all at once. Moreover, a banking expert testified at trial that Joyner's cash withdrawal activity was indicative of structuring. This evidence was sufficient to permit the jury to infer Joyner's knowledge and intent. *See United States v. Van Allen*, 524 F.3d 814, 820 (7th Cir. 2008) (noting that knowledge and intent can be shown by evidence that defendant, despite inefficiency and inconvenience, dealt in small amounts that avoided reports).

### III.

Joyner and Ibeh next argue the district court erred by issuing a willful blindness instruction to the jury when there was no evidentiary basis for one. The willful blindness doctrine imputes knowledge to defendants who purposely avoid knowledge of facts that would support a conviction. *See Global-Tech Appliances, Inc., v. SEB S.A.*, 563 U.S. 754, 766-67 (2011) (noting that doctrine is well-established in criminal law). The district court instructed the jury that the Government could prove that Appellants acting knowingly by showing that they "deliberately closed [their] eyes to what otherwise may have been

9

obvious." Further, the court noted that knowledge may be shown by "a deliberate or intentional ignorance or deliberate or intentional blindness."

Appellants contend that the instruction was improper because there was no evidence they knew that they were participating in a criminal scheme and because the evidence showed that they acted transparently and made no efforts to hide their identities. There are two requirements for willful blindness: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc.*, 563 U.S. at 769. A willful blindness instruction is appropriate if evidence indicates that a defendant deliberately maintains his ignorance. *See United States v. Abbas*, 74 F.3d 506, 513-14 (4th Cir. 1996) (finding evidence supported willful blindness instruction where jury could find that Abbas "consciously closed his eyes to the fact that he was involved in an obvious [criminal] transaction").

Here, there was ample evidence that, at the very least, Appellants deliberately chose not to find out the details of the scheme in which they were participating. Notably, Joyner never asked why his bank accounts were closed and never sought information from Ibeh about the nature of the transactions made through his accounts or why Ibeh could not use his own account. Regarding the structuring, there is no evidence that Joyner ever investigated why he was asked to make numerous withdrawals under $10,000, when he could have more easily withdrawn a larger sum all at once. Turning to Ibeh, he stated in his interview that the people "overseas," who were in charge of the scheme, did not share information with those in the United States and that it was this fact along with others that

10

led Ibeh to believe that the scheme was criminal in nature. Nonetheless, there is no evidence that he did an investigation or asked questions of either his contacts or the banks. This evidence of omission on the parts of both Appellants was sufficient evidence of deliberate ignorance to support the willful blindness instruction. *See United States v. Ravenell*, 66 F.4th 472, 491 (4th Cir. 2023) (noting that "avoiding accountability by saying 'I don't want to know where the money comes from' does not form the basis of a legally tenable defense"), *cert. denied*, 144 S. Ct. 1344 (2024); *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017) (willful blindness instruction appropriate when evidence suggested defendant "deliberately failed to ask questions that might have incriminated him").

## IV.

Finally, Ibeh challenges the four-level enhancement to his offense level under the Sentencing Guidelines based on his leadership role in the offense. U.S. Sentencing Guidelines Manual § 3B1.1. The district court based the enhancement on Ibeh's recruitment of other coconspirators and his relative culpability. Generally, in reviewing a challenge to the district court's Sentencing Guidelines calculation, we review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Allen*, 909 F.3d 671, 677 (4th Cir. 2018). However, "when a party does not preserve an argument in the district court, we review only for plain error." *United States v. Lynn*, 592 F.3d 572, 577 (4th Cir. 2010).

Ibeh asserts that the objection in his sentencing memorandum was sufficient to preserve his claim. The Government argues that, because his objection was untimely under

11

Fed. R. Crim. P. 32(f) and because he stated that there were no objections at his sentencing hearing, the issue is reviewed for plain error. Ibeh's contention is without support. *See United States v. Bennett*, 698 F.3d 194, 199 (4th Cir. 2012) (noting that "[t]he entire purpose of an objection is to alert the district court to the actual basis of the asserted error" in order to enable the court "to correct possible error in short order and without the need for an appeal"). Because Ibeh withdrew any objection he had at the sentencing hearing, we review for plain error.

To establish plain error, Ibeh must show (1) error, (2) that "is clear and obvious," and (3) that "affected his substantial rights." *United States v. Fowler*, 948 F.3d 663, 669 (4th Cir. 2020). If the defendant makes this showing, we may correct the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (cleaned up). Pursuant to Fed. R. Crim. P. 32(i)(3)(A), the sentencing court "may accept any undisputed portion of the [PSR] as a finding of fact." Moreover, even if a defendant objects to a finding in the PSR, absent "an affirmative showing the information is inaccurate, the court is free to adopt the findings of the [PSR] without more specific inquiry or explanation." *United States v. Love*, 134 F.3d 595, 606 (4th Cir. 1998) (cleaned up).

In light of Ibeh's failure to affirmatively show that he did not direct or recruit Joyner and others, there was no error, let alone plain error, in the district court's reliance on the PSR regarding this factual finding. Turning to Ibeh's relative culpability argument, Ibeh attempts to show that he was less culpable than the persons responsible for the BEC scheme. However, Ibeh was not convicted for his part in that scheme; instead, he was convicted for crimes committed during the conspiracy to launder the funds of the BEC

scheme. The evidence at trial, and outlined in the PSR, easily showed that Ibeh was a leader of that conspiracy. Moreover, to the extent that the BEC organizers were also part of the money laundering conspiracy, there can "of course" be more than one leader of a criminal conspiracy. *See* USSG § 3B1.1, n.4. Accordingly, the district court did not plainly err in applying the enhancement.

As such, we affirm Appellants' convictions and Ibeh's sentence. We grant Ibeh's motion to exceed the length limitations on the joint appendix. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED*

13